No. 86,429

DOUGLAS DIEKER and THOMAS DIEKER, *Appellees*, v. CASE CORPORATION, *Appellant*.
(73 P.3d 133)

YALE LAW LIBRARY

142

Opinion filed July 25, 2003.

*Heather S. Woodson*, of Stinson Morrison Hecker LLP., of Overland Park, argued the cause, and *Mark M. Iba*, of the same firm, of Kansas City, Missouri, was with her on the briefs for appellant.

*Blake Hudson*, of Hudson & Mullies, L.L.C., of Fort Scott, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

BRAZIL, J.: Douglas Dieker and Thomas (Tom) Dieker (plaintiffs) purchased a new Case combine which caught fire after 12 days of use during soybean harvest. In the jury trial against defendant Case Corporation (Case), plaintiffs presented a breach of implied warranty claim and the jury awarded them $96,344.35 in damages. The trial court denied Case's renewed motion for judgment as a matter of law or, in the alternative, a new trial. Case appealed, contending that the district court erred by permitting plaintiffs' expert witness to testify concerning the probable cause of the fire. The Court of Appeals reversed and remanded with directions to enter judgment as a matter of law in favor of Case. *Dieker v. Case Corp.*, 30 Kan. App. 2d 751, 48 P.3d 5 (2002). This court subsequently granted plaintiffs' petition for review.

We reverse the Court of Appeals and affirm the trial court.

The last week of September 1998, plaintiffs purchased a new Case IH 2388 combine from J & W Equipment in Iola, Kansas. On October 24, 1998, after using the combine for approximately 12 days and having 120 hours on the engine, the combine caught fire while Douglas was harvesting soybeans.

On July 1, 1999, plaintiffs filed a defective products liability action, pursuant to K.S.A. Chapter 60, alleging three counts against defendant Case: (1) negligence in the manufacture, design, inspection, and/or testing of the fitting located on the hydraulic control valve on top of the combine's transmission; (2) breach of implied warranty of fitness for a particular purpose and breach of the implied warranty of merchantability; (3) a strict liability claim in the sale of a product in a defective and unreasonably dangerous condition. Plaintiffs sought $98,344.35 in damages from Case.

Case moved for summary judgment, claiming that plaintiffs' tort claims were barred by the economic loss rule, that no implied warranty of fitness for a particular purpose ever arose, and that plaintiffs could not prove the requisite elements of their claim for breach of implied warranty of merchantability. The trial court granted in part and denied in part Case's motion for summary judgment. The trial court found that plaintiffs' negligence and strict liability claims were barred by the economic loss doctrine and that plaintiffs had abandoned their claim for breach of implied warranty of fitness for a particular purpose. The trial court denied summary judgment on plaintiffs' claim for breach of the implied warranty of merchantability, however, finding that genuine issues of material fact existed with respect to that claim.

In addition, Case filed a motion to dismiss or, in the alternative, to substitute the real party in interest, claiming that subrogee Farm Bureau Insurance was the real party in interest in the case. After analyzing pertinent case law, the trial court found that "the bright line rule enunciated by the appellate courts of this state is that the loss must be fully paid for the insurance company to be the real party in interest." Because Farm Bureau had not fully paid plaintiffs for their loss due to their $100 deductible obligation, the trial court denied Case's motion.

The pretrial conference order reflects the specific contentions of the parties. Plaintiffs alleged that during the assembly of their combine, Case left a fitting loose on the valve body of the parking brake and feeder house, which allowed hydraulic oil to leak during the operation of the combine. They maintained that the leaking oil saturated chaff that accumulated in the area of the valve body, which ultimately prevented heat generated by the valve and/or solenoids connected to the valve from dissipating properly, resulting in the fire that destroyed the combine. Plaintiffs asserted that this manufacturing defect constituted a breach of the implied warranty of merchantability under the Kansas Uniform Commercial Code. See K.S.A. 84-2-314. Case's position was that plaintiffs could not prove their claim for breach of the implied warranty of merchantability because they could not prove the combine was defective or that a defect existed when the combine left its control. Case as-

serted that plaintiffs' experts could not pinpoint the exact cause of the fire that destroyed the combine and that the damage to the combine was the result of plaintiffs' own negligence or fault in failing to properly and adequately clean and maintain it or in improperly operating the combine.

On the morning of trial, the court heard Case's pretrial motion to exclude testimony of plaintiffs' expert witnesses. Counsel for Case argued:

"The issue which the plaintiffs' experts intend to testify, of course, is the cause of the fire that damaged this combine. The experts that have been designated by [plaintiffs] can certainly testify that they found a loose fitting on the combine, that this is their actual knowledge, and they can testify that they believe hydraulic fluid leaked from that fitting. The problem is, they cannot take that crucial next step to testify that the hydraulic fluid could have caused the fire. There were really two deficiencies in their qualifications. First, is that neither one of them has enough education, training, or experience in fire causation and origin investigation. . . .

. . . .

" . . . But the second deficiency in Mr. Pfeiffer and Mr. Hellar's opinion may be even more important, the problem that they have is that they came to their conclusion without basic fundamental knowledge of the science involved in the determining the cause and origin of the fire. They didn't know the chemical composition of the hydraulic fluid involved."

In sum, Case asserted that plaintiffs' experts were not qualified to come to the scientific conclusion that the hydraulic fluid soaked debris caused the fire. Plaintiffs' counsel maintained that while Pfeiffer and Hellar would not be qualified to give opinions as to cause and origin of fires in all cases, they were qualified to present their expert opinions as to cause and origin of mechanically caused fires. Plaintiffs' counsel further argued:

"[W]here the fire can clearly be traced to a mechanical cause, mechanical engineers with just a rudimentary understanding of the process of fire, knowing that they can testify certainly that the hydraulic fluid is combustible, nobody is arguing about that. So they have that knowledge and these particular types of cases, they certainly are competent to make those conclusions."

Before ruling, the trial court heard the voir dire of plaintiffs' expert, Jay Pfeiffer. Counsel for plaintiffs conceded that Hellar's testimony would be cumulative to Pfeiffer's and agreed Hellar

would only give his opinion that there was an oil leak at the valve that was preexistent to the fire. The trial court found Pfeiffer had sufficient knowledge, skill, experience, and training to offer his opinion as to the cause and origin of the fire and denied Case's motion to exclude Pfeiffer as an expert. According to the trial court, the objections raised by Case were valid but went to the weight and credibility to be accorded to Pfeiffer's testimony rather than its admissibility.

At trial, Douglas Dieker testified that the ground was wet enough on the day of the fire that a grain truck or pickup would have become stuck if driven in the fields, but because they had installed flotation tires on the combine, they were able to use the combine to harvest the fields. During the 12 days they had the combine, he said they had cut milo on 3 or 4 days and soybeans on the remaining days. Douglas stated that as he was cutting through a field of soybeans, the parking brake light and alarm went off when he was within 200 feet of the end of the field. He stopped the combine immediately, looked at the parking brake switch, saw that it was not on, and thinking the alarm was caused by a malfunction, began driving the combine again. At that point his father Tom flagged him down, and Douglas stopped the combine about 50 feet from where he initially stopped. He exited the combine and saw a fire underneath the cab between the axles and the transmission area. Douglas testified that his father grabbed a fire extinguisher from his truck, brought it to the combine, and they tried to put out the fire. After the fire extinguisher failed, Douglas said that he took the pins out of the header and drive lines, dropped the header to the ground, and backed the combine 15 to 20 feet from the header while Tom radioed home to tell his wife to call the fire department. The combine engine died at that point, and Douglas got out and watched the combine burn as he waited for the firemen to arrive. Later, he noticed a one-quarter-inch-wide trail of oil in the field that extended about a quarter of a mile back from the combine. He testified that before the fire he had no problems with the combine, never smelled any strange smells, never heard any unusual noises, and never saw any leaks.

In his experience, Douglas stated it was normal for debris and chaff to accumulate on combines during harvest in the area behind the transmission area and on top of the feeder housing as the combine draws air into the cleaning fan. Douglas testified that while they would clean debris from the feeder housing daily when they removed the header from the combine in preparation for moving it down the road, they did not normally clean the transmission area. He stated that a couple of days before the fire he had looked in the transmission area and noticed lint from soybean leaves and dust in that area. He had noticed an accumulation of debris in the transmission area of other Case combines he had operated before. Douglas said that normally they would clean debris from the transmission area when they had cut milo for several consecutive days after checking to determine whether there was an excessive accumulation of leaves, but that he did not remember cleaning the transmission area on this combine. Douglas stated that, in his opinion, even if he had cleaned the transmission area the morning before this fire, debris would have accumulated there during the operation of the combine that day. He further testified that they had operated Case combines since 1990 without ever cleaning out the transmission area on a daily basis, yet had never experienced any fires on other Case combines.

Tom Dieker testified that he farmed approximately 2,500 acres with his son, Douglas, and that he had farmed for over 40 years. Tom stated that he first saw the fire under the combine as Douglas approached and raised the header. "I could see it was engulfed behind the axles, it was blazing up about that high (indicating) and it was probably as wide as the axle." Tom said that as soon as they had emptied the fire extinguisher of its dry chemical, "the fire came right back up." He radioed home while Douglas unhooked the header. In just a few minutes, the cab of the combine had melted off. Tom stated they would have been working in vain to attempt to keep debris out of the transmission area on Case combines because it constantly accumulated there. Tom stated that they did not discover any leaks on the new combine before the fire.

Plaintiffs notified their insurer of the fire, and the senior claims adjuster for Farm Bureau Insurance Company, Jeff Bohnenblust,

traveled to the field to inspect the combine. Bohnenblust testified: "I knew that we had a mechanical failure on a combine this new, so I contacted my Regional Manager to get authority to bring in a mechanical engineer to inspect the combine and that we would do a cause and origin tear down. . . ." He then contacted the Kennedy and Pfeiffer firm in Wichita to perform the inspection. After Pfeiffer had performed his initial inspection, he told Bohnenblust the focus of the inspection was on an O-ring or fitting oil leak.

Jay Pfeiffer, a professional mechanical engineer, testified at trial as an expert witness for plaintiffs. His education includes a Bachelor of Science degree in mechanical engineering from Wichita State University and additional graduate engineering courses in statistics and strength analysis/structural analysis. He stated that his educational background included course studies in thermodynamics, fluid flow, and heat transfer which touch upon the topics of fire and thermodynamics. Pfeiffer is a member of the National Society of Professional Engineering, the National Academy of Forensic Engineers, the Society of Automotive Engineers, and the Air Brake Association.

Pfeiffer told the court that after graduating from college, he worked as a design engineer for 3 years at Boeing Military Aircraft Company. His work involved the "systems design" of air systems, fuel systems, hydraulic systems, and control systems for military aircraft. Next, he worked at Rezac Engineering, a private engineering firm in Wichita. While employed there, Pfeiffer was assigned to work on investigations of fires involving automobiles or other equipment. Pfeiffer testified that "our investigations were primarily mechanical in orientation, was there a mechanical problem with components or machinery that could have caused or led to a fire."

Pfeiffer testified that he and Don Hellar, another professional engineer from Kennedy and Pfeiffer, performed an inspection of the combine at J & W Equipment on November 5, 1998. They took photographs and studied the burn patterns and the damage from various angles and had a mechanic from J & W Equipment assist in removing the valve body from the top of the transmission that controls the feeder house and park brake and a solenoid hy-

draulic line. They took the control valve and hydraulic line back to their office for further inspection. Pfeiffer stated that the purpose of observing the burn patterns was to establish the origin of the fire and to evaluate how the fire progressed. Pfeiffer concluded from his observations that the fire clearly originated in the area of the transmission and, in particular, at the area of the hydraulic control valve. Pfeiffer testified that hydraulic fluids were combustible.

Prior to the removal of the control valve from the combine, Pfeiffer had observed that one of the hydraulic fittings was loose and that the nut was not fully tightened. He also told the jury that he observed there was evidence of grime and greasy build-up on the side of the transmission, which indicated there had been a low-volume oil leak prior to the fire.

Pfeiffer testified that, in Wichita, they removed the back fitting and elbow fitting from the valve body, took photographs, and visually inspected them. Both fittings had O-ring seals which were examined. Pfeiffer testified that:

"The back fitting was again tight [and] when we pulled it out we could see the hydraulic, or the O-ring seal was in place, but the seal had places where it had cracked consistent with heat damage from being heated, and the seal then splitting and cracking in a regular or distinct pattern. The fitting on the elbow fitting, the O-ring on that fitting exhibited a different pattern, and it had a pattern where a portion of the O-ring was missing, not a full section of it but a, like along one edge, a portion of it was missing and broken away, and it's a common condition in O-ring seals that is referred to as nibbling or erosion where the seal is not sealing properly and the hydraulic fluid is going past it, and as it goes past it, it kind of tears away or erodes away or nibbles away the edge of the O-ring itself. So we observed that, this ring, the O-ring had that characteristic, and that is also something that would be consistent with a loose fitting if you had an improper tightening of the fitting or seal, then the O-ring is stretched and tried to fill into the area where it is not properly tightened, and as the pressure continues, you can get fluid getting past it and just eroding, tearing, [or] nibbling away at the seal causing greater damage and eventually greater and greater fluid leakage."

Pfeiffer testified that after completing his analysis, he formed the opinion that the origin of the fire was at the control valve on top of the transmission in the area of the solenoids and the valve body. When asked if he had formed an opinion as to the cause of

the fire, counsel for Case renewed its previous objection as to Pfeiffer's qualifications, but the trial court overruled the objection. As to the cause of the fire, Pfeiffer testified:

"My opinion is that there was an oil leak preexisting the fire occurring at this fitting (indicating) due to the improper sealing of the O-ring; that there was a hydraulic leak initially; that it was causing the fluid to come out and accumulate on the side of the valve body; and also caused the debris accumulation on the side of the transmission itself that was visible in the two photographs. This leak was not a leak where lots of fluid was being pumped out that would cause dripping, but it was a leak in which fluid was coming and causing to accumulate and cling to the transmission that then caused debris to, as it landed in this wetted surface, to stick and accumulate. So this fitting (indicating) was leaking and caused a fluid coating in here (indicating), which then caused—precipitated the debris build-up. The debris build-up in the fluid in this corner of the valve (indicating) [was] the origin of the fire. And the only thing that required at that point would have been heat to get this fire going. Since the fire started here (indicating) the heat had to come from the valve body itself, from the hydraulic operation of the valve body and the solenoids which are attached to the valve body, both which will be—have improper heat exchange [due] to the fluid coating and also due to the debris that was built up in this area. There is a lack of circulation and the debris caused hydraulic accumulation, so the fire started here because the build-up in heat resulting from the fluid leakage and the debris accumulation."

Pfeiffer also testified that the heat sources for the fire came from the hydraulic operation of the valve body, the solenoids which were activated at all times during the operation of the combine, and from an overfilled transmission. He did not believe these components were overheating internally, but that they heated sufficiently to start the fire because they were the only possible sources of heat at that location in the combine.

On cross-examination, Pfeiffer admitted that he did not know the specific temperature of the flash point of the hydraulic fluid or how hot the solenoids would have gotten when covered with oil soaked debris. Although Pfeiffer conceded he did not know the current the solenoids drew, he stated that he knew that a solenoid could get hot enough to burn.

On redirect, counsel for plaintiffs asked Pfeiffer why specific ignition temperatures, flash points, solenoid temperatures, chemical makeup of fluids, and currents were not important to him in

reaching his opinion on the origin or cause of the fire. Pfeiffer replied:

"Well, they're—we know that—we have videotape of the fire ongoing and we know that this fluid will burn, so it is not important to determine at what temperature will it burn. We know it will burn and support the combustion process that was occurring. We know that it did catch on fire and we know where it caught on fire, so the only question is, what, in reaching my opinion, what in this area could have caused a heat accumulation that could have resulted in the fire. And the only thing that could have occurred here is the heat accumulation of the valve body and also of the solenoids. Now those other questions would be useful in designing for instance, if Case was going to design this differently to change the heat build-up, those would be good questions to ask and that would be a study that would be formed in order to make that evaluation, but that is not what I am doing."

Don Hellar also testified as an expert witness on behalf of plaintiffs. Hellar's background includes experience as both a professional engineer and a wheat farmer. Hellar stated that when he and Pfeiffer first looked at the combine at J & W Equipment, it "was pretty obvious where the fire had started on the right side, in behind the wheel where the most burn damage was . . . ." In addition, he noted oil on the side of the transmission that had been there since before the time of the fire. After looking at the combine, he said they found the loose valve body fitting on top of the solenoid. Hellar testified that the O-ring on the angle fitting exhibited "nibbling" which indicated there was a leak of hydraulic fluid. He also told the jury:

"There was oil soaked debris on top of the transmission toward the front edge. There was still some on top of the right parking brake housing. There was still debris around this valve body and partially underneath the forward edge of it.
. . . .
"It was—well, it was what I would call chaff, small particles from—that are around the grain head that accumulates when the oil started being in that area. The chaff would stick to it and that is what was in this area."

Hellar conceded on cross-examination that he could not say whether the fire would have started without the debris build-up in the transmission area.

At the close of Hellar's testimony, plaintiffs rested their case. At that time, Case moved for judgment as a matter of law, arguing

that plaintiffs did not meet their burden of proving that a defect existed at the time the combine left Case's custody and control, or that plaintiffs suffered damages as a result of such a defect. Case asserted that "[t]he only reasonable inference from plaintiffs' evidence is that their lack of maintenance caused the fire." Further, Case argued that plaintiffs had to show that the leak actually caused the fire, and that because Pfeiffer did not know how hot the body of the transmission was there was no evidence that the components in the transmission area caused the fire.

Plaintiffs' counsel argued that there was enough circumstantial evidence for the jury to infer that the loose fitting originated at Case, that their experts were qualified to testify, that their theory as to the cause of the fire was reasonable, and that the circumstances supported their theory. The trial court denied Case's motion for judgment as a matter of law. The court held the evidence led to the reasonable inference that if the jury found that a defect existed, that it existed at the time it left Case's possession or control, and that Pfeiffer's testimony provided evidence a jury could rely on to find that the cause of the fire was the oil leaking from the O-ring. Thereafter, Case proceeded to present its witnesses.

Gary Downey, the combine and header product performance manager for Case, testified that Case employees use a black light to inspect its combines for hydraulic leaks after the final assembly. He stated that, in his experience as a product performance manager, other things besides mechanical problems could result in a fire in the transmission area of a 2388 combine. Downey testified:

"There are other things that can start fires. The engine compartment, which we talk about being so critical, contains the exhaust system which reaches—engine exhaust system can reach very high operating temperatures if debris is allowed to accumulate in that area and not cleaned regularly, the debris can become very hot and it can be blown by the engine and the cooling fan and when that occurs, that ember that is now hot can bounce to any location. It can bounce to the ground, it can bounce and get caught by the wind and land on any area of the machine.

. . . .

"The header can cause sparks that can be picked up in the machine if you are running a header on the ground and you hit either a rock or, you know, a field cultivator shank or something like that, you can create sparks in that way. Sometimes rodents are attracted to combines, they like it because there is food there

and among the chaff there is grain, they like to chew on the electrical wiring, installations and they can quickly chew the insulation off, wires can ground themselves and cause a spark which can ignite material."

Richard Keith appeared on behalf of Case as an expert fire investigator. Keith's educational credentials included a Bachelor of Science in Fire Investigation Administration, an Associate of Science degree in Fire Science, explosive and firearms school through the United States Treasury Department's Division of Alcohol, Tobacco and Firearms, and fire-related seminars and symposiums. Keith has been certified as a state, national, and international fire investigator. Although Keith did not conduct an inspection of the combine itself, he testified that he was able to review the underside of the valve body and photographs and reach a conclusion as to the likely cause of the fire. Keith testified that, like Pfeiffer, he believed the fire originated on the top of the transmission toward the right side of the combine. Keith had a different opinion of the cause of the fire, however, and stated:

"In my opinion, the most probable cause was the continued heating of dry chaff and milo leaves and other field trash that had collected around the solenoid valve of the feeder clutch brake valve, and on top of the transmission. And since there is evidence to indicate there was a good layer of that material on top of all those items, therefore preventing the heat from escaping basically from the solenoid on the front of the feeder clutch valve assembly. And that that heat started what fire investigators call 'pyrolysis,' which is actually charring of the dry chaff and other materials. And as the material chars, then the ignition temperature of it lowers somewhat, like making charcoal. Charcoal lights easier than the wood it is made from. As the ignition temperature lowers and the heat continues to build, then we have a smolder type fire begin and that, at some point, when air reaches it, it will begin burning with greater velocity."

Keith testified that the solenoid valves operated at around 180 to 185 degrees Fahrenheit, and the transmission operated at 150 degrees. He stated that normal field trash such as dry milo leaves and chaff would ignite at around 325 to 350 degrees Fahrenheit, but that pyrolysis would lower that ignition temperature. According to Keith, had the Hy-tran hydraulic fluid used in plaintiffs' combine leaked onto the debris, it would have wet the debris and raised the ignition point of the field trash to 500 to 700 degrees Fahrenheit. He also stated that if the hydraulic fluid had ignited, any further

fluid coming out would have ignited and there would have been a trail of fire behind the combine rather than just fluid. In Keith's opinion, the leaking hydraulic fluid resulted from the fire, not the other way around. On cross-examination, Keith stated that "the chaff could ignite and in turn ignite the oil/chaff mixture."

After deliberations, the jury unanimously found for plaintiffs and assessed damages in the amount of $96,344.35. Case renewed its motion for judgment as a matter of law pursuant to K.S.A. 2002 Supp. 60-250(b), or alternatively, for a new trial. The trial court denied the motion, and Case timely appealed.

The Court of Appeals reversed and remanded the matter with directions to enter judgment as a matter of law in favor of Case. The panel found the record did not show Pfeiffer "possessed the education, training, knowledge, and experience required to express an opinion the conditions he described could cause the fire . . . ." 30 Kan. App. 2d at 753. The court stated:

"It is unquestioned that Pfeiffer was well qualified to express an opinion that a mechanical problem led to a hydraulic fluid leak. But it is entirely outside his expertise to opine that hydraulic fluid soaked field debris could ignite from built-up heat from that debris. Pfeiffer's testimony disclosed no specialized knowledge, training, or experience that would lend itself to giving the opinion he gave.

"Pfeiffer's conclusion the conditions he described must have caused the fire because a fire did, in fact, occur is based on a logical fallacy and demonstrates his lack of proper credentials to give the opinion: There is still no showing the hydraulic fluid soaked debris caused a heat build-up sufficient to cause ignition. Pfeiffer admitted he did not know the temperature at which hydraulic fluid soaked field debris would ignite and did not know the operating temperatures of the nearby mechanical components of the combine.

"The fact certain conditions existed and the fact a fire occurred is not evidence the conditions *caused* the fire. Such is no more than a post hoc, ergo, propter hoc opinion—after this, therefore, on account of it; fallacious reasoning. [Citations omitted.]" 30 Kan. App. 2d at 753.

Finding that Pfeiffer's opinion was based on speculation and conjecture lacking probative value, the Court of Appeals held the trial court should have rejected it. Further, because Pfeiffer's testimony was the sole evidence offered by plaintiffs on causation, the panel concluded plaintiffs did not have a submissible case. 30 Kan. App. 2d at 754.

## I. THE OPINION TESTIMONY OF JAY PFEIFFER

In their petition for review, plaintiffs assert that the trial court properly admitted the opinion testimony of their expert, Jay Pfeiffer, on the cause of the combine fire. Plaintiffs ask this court to reverse the Court of Appeals' decision and affirm the trial court's judgment in their favor.

"The qualification of an expert witness as well as the admissibility of expert testimony are matters within the broad discretion of the trial court. The admissibility of expert testimony is a matter to be determined by the trial court in the exercise of its discretion. The trial court's determination will not be overturned absent an abuse of such discretion. *Olathe Mfg., Inc. v. Browning Mfg.*, 259 Kan. 735, 762, 915 P.2d 86 (1996). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court. [Citation omitted.]" *City of Wichita, Kansas v. Eisenring*, 269 Kan. 767, 776, 7 P.3d 1248 (2000).

Case's principal assertion is that Pfeiffer lacks knowledge, skill, experience, and training in fire investigation and, thus, was not qualified to testify as to the cause of the fire. At trial, Case argued Pfeiffer could not pinpoint the exact cause of the fire that destroyed the combine and that the damage to the combine was the result of plaintiffs' own negligence or fault in failing to properly and adequately maintain the combine. According to Case, Pfeiffer's testimony demonstrates that his training as a mechanical engineer did not provide him with sufficient expertise to opine that leaking hydraulic fluid caused debris to accumulate causing heat to build up sufficient to cause the debris to ignite. Case argues that Pfeiffer's opinion went beyond his knowledge and training and, therefore, that the trial court abused its discretion by allowing him to testify on the cause of the fire.

More specifically, Case asserts that Pfeiffer should not have been allowed to testify on the cause of the fire because he failed to determine whether the components in the transmission area could have generated sufficient heat to ignite the hydraulic fluid soaked debris and never tested his theory. Case maintains that Pfeiffer assumed his conclusion that the solenoids or valve became hot enough to cause a fire based on the fact a fire resulted, not based

on any special knowledge, skill, experience, or training. Case, however, concedes that Pfeiffer was qualified to testify that he believed there was a leak of hydraulic fluid before the fire started.

Plaintiffs claim that Pfeiffer's expert opinion that hydraulic fluid soaked field debris could ignite from heat build-up from the engine components was based on well-recognized principles known to mechanical engineers and other individuals possessing a general scientific background of heat transfer or exchange, *i.e.*, that heat not allowed to properly dissipate will build up. They contend that Case's expert's conclusions were essentially the same as Pfeiffer's, save that Pfeiffer opined that the heat built up under oil soaked chaff, whereas Case's expert believed the heat built up under dry chaff. Plaintiffs maintain that the actual ignition temperatures were irrelevant because, whatever they were, there is no question they were reached. They argue that Case's complaints concerning Pfeiffer's testimony go to the weight given the testimony, not to the witness' qualifications. According to plaintiffs, there is no question that Pfeiffer was qualified to testify about a preexisting oil leak and, once jurors accepted his position as to the leak, it was logical and reasonable for them to conclude he was correct about the oil soaked chaff igniting.

Plaintiffs take issue with the Court of Appeals' ruling, first noting that the panel did not specifically address Pfeiffer's background. In addition, plaintiffs assert that the panel's restrictive ruling was in contravention of appellate precedent giving the trial court considerable discretion in determining whether to permit expert testimony, opening a floodgate of appeals regarding the qualifications of expert witnesses. We agree.

"As a prerequisite for the testimony of [any] witness on a relevant or material matter, there must be evidence that he or she has personal knowledge thereof, or experience, training or education if such be required. Such evidence may be by the testimony of the witness himself or herself." K.S.A. 60-419.

"The trial court has broad discretion in admitting or excluding the testimony of an expert witness. Necessity arising out of the particular circumstances of the case is the basis for the admission of expert testimony. To be admissible, expert testimony must be helpful to the jury. Where it is not helpful, that is, where the normal experience and qualifications of laypersons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert testimony

is inadmissible." *State v. Papen*, 274 Kan. 149, 157, 50 P.3d 37 (2002) (citing *State v. Smallwood*, 264 Kan. 69, 80, 955 P.2d 1209 [1998]).

"For a witness to testify as an expert on a particular subject, the witness must have skill or experience in the business or profession to which the subject relates." *Choo-E-Flakes, Inc. v. Good*, 224 Kan. 417, 419, 580 P.2d 888 (1978)." In Kansas, the admissibility of expert testimony is subject to K.S.A. 60-456(b)." *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 454, 14 P.3d 1170 (2000).

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness." K.S.A. 60-456(b).

The Court of Appeals panel compared this case to *Trimble, Administrator v. Coleman Co., Inc.*, 200 Kan. 350, 437 P.2d 219 (1968), stating:

"The present case is somewhat similar to *Trimble* . . . . There, the trial court refused to admit the opinion testimony of plaintiff's expert, even though defendant raised no questions as to the expert's general expertise. Having examined a photograph of the gas heating stove and a pamphlet of general operating instructions, the expert was familiar with the stove in question and with similar types of stoves.

"The expert opined that a gas heating stove, if properly manufactured, properly assembled, properly installed, and properly adjusted, should not generate carbon monoxide gas. And assuming the stove in question did produce carbon monoxide gas after being carefully installed and adjusted, the expert was of the opinion the manufacture of the gas stove 'was defective somewhere.' 200 Kan. at 354.

"The trial court rejected the testimony because the opinions stated were based on speculation and conjecture, and the Supreme Court affirmed the ruling. 200 Kan. at 357. It is not enough for the expert to assert opinions based on fact not known or presented. See 200 Kan. at 357. The mere fact an injury occurs is not sufficient to establish liability. 200 Kan. at 359." 30 Kan. App. 2d at 753-54.

In *Trimble*, the administrator of the Estates of James and Inez Griffin brought suit against the Coleman Company, Inc., seeking damages for their wrongful deaths. The Griffins purchased a gas heating stove on January 14, 1963, and were found dead the next day of carbon monoxide poisoning. On appeal, the administrator argued that the trial court erred in refusing to admit the testimony of Dr. Fred Kurata, an expert on the subject of the thermodynamic

and physical properties of natural gas. The *Trimble* court observed: "No question [was] raised as to his general expertise in his field." 200 Kan. at 354.

At his deposition, Dr. Kurata testified that he had not inspected the gas heating stove either before or after the incident but that, on the day of his deposition, he had examined a photograph of the stove and a booklet of general operating instructions. Dr. Kurata testified he was familiar with this stove and other like stoves. Dr. Kurata stated that if a gas heating stove was properly manufactured, assembled, installed, and adjusted, it should not generate carbon monoxide gas.

Significantly, Dr. Kurata presented alternative opinion testimony regarding the cause of the carbon monoxide gas. In response to purely hypothetical questions, he opined that if a heating stove produced carbon monoxide gas after careful installation and adjustment, the cause of the stove's production of carbon monoxide gas was that "the manufacture was defective somewhere." Alternatively, he stated that if such a stove were properly designed and manufactured, yet when lit produced carbon monoxide gas, the cause of the gas in that hypothetical situation was that "the adjustment was improper." 200 Kan. at 354-55.

The trial court rejected the deposition testimony of Dr. Kurata after defendants objected on the basis that Dr. Kurata had no personal knowledge of facts concerning the particular stove in question, that the opinions given were not predicated upon facts in evidence at trial, and that the opinions failed to interpret evidence which would assist jurors in coming to an ultimate decision in the case.

This court upheld the decision of the trial court in *Trimble*, noting that an expert witness must "base his testimony upon facts personally perceived by or known to him or made known to him at the hearing," and stating that the admissibility of expert witness testimony was a matter entrusted to the sound discretion of the trial court. 200 Kan. at 356-57. We note, however, that the *Trimble* opinion appears to place the greatest emphasis on the hypothetical nature of the questions put to Dr. Kurata and his alternative causation opinions. The *Trimble* court wrote:

"The province of an expert witness is to aid the jury in the interpretation of technical facts or to assist in understanding the material in evidence. It is not his province to state simple conclusions based upon facts which could be, but which have not been, placed in evidence. [Citations omitted.]

. . . .

"Under the facts placed in evidence these hypothetical questions are questionable in form and foundation. *They appear objectionable because when asked in the alternative the answers would not aid a jury in interpreting technical facts or assist in understanding the material in evidence.* The hypothesis upon which each question was presented was not sufficiently founded upon the facts in evidence. The trial court acted within its sound discretion in excluding Dr. Kurata's deposition and we find no error therein." (Emphasis added.) 200 Kan. at 357.

While the *Trimble* court mentioned Dr. Kurata's lack of personal knowledge concerning the particular stove in question, the strongest justification for upholding the trial court appears to be that the expert witness testified as to alternate causes for the release of carbon monoxide gas in answer to the hypothetical questions asked at his deposition. Thus, this court believed, as did the trial court, that his opinions would not have assisted the jury in reaching an ultimate conclusion as to which, if any, of the parties were at fault in the carbon monoxide poisoning deaths.

*Trimble* is distinguishable from the present case in that here, Pfeiffer performed a physical examination of the combine and formulated an opinion as to the specific cause of the fire. In addition, the *Trimble* opinion did not concern itself with Dr. Kurata's background and qualifications. He was simply found to have general expertise in the field of the thermodynamic and physical properties of natural gas and was familiar with the type of stove in question, which was enough to qualify him to render an expert opinion on the cause of the carbon monoxide gas by the heating stove in question. Thus, the *Trimble* court affirmed the trial court's discretionary decision excluding the expert's testimony. 200 Kan. at 357.

In support of its argument on appeal that Pfeiffer lacked sufficient qualifications to testify on the cause of the combine fire, Case cites K.S.A. 60-456(b); *Choo-E-Flakes, Inc.*, 224 Kan. at 419; *State v. Duncan*, 221 Kan. 714, Syl. ¶ 6, 562 P.2d 84 (1977); *Meinhardt v. Kansas Power & Light Co.*, 8 Kan. App. 2d 471, 661 P.2d 820 (1983); and *Voelkel v. General Motors Corp.*, 846 F. Supp. 1468,

1476-80 (D. Kan. 1994). The facts of those cases are widely different from those presented here and lend little support to Case's argument.

In *Choo-E-Flakes, Inc.*, this court upheld the trial court's refusal to permit an entomologist and administrative director of agriculture board programs to testify as an expert on grain milling and mixing feed. 224 Kan. at 419. The *Duncan* case involved a murder trial, and this court affirmed the trial court's ruling on the admissibility of a detective's opinion as to whether the crime could have been committed elsewhere when the detective had testified he did not view the body at the scene and was not familiar with the case. 221 Kan. at 723-24. The Court of Appeals in *Meinhardt* affirmed the trial court's decision to exclude the testimony of the landowners' expert concerning "alleged hazardous biological effects created by overhead [electric] transmission lines" in a condemnation action brought to decide the sole issue of just compensation. 8 Kan. App. 2d at 471-73. In *Voelkel*, the court held that plaintiff's expert failed to provide favorable testimony causally linking the injuries to a possible defect in the seat belt buckle of plaintiff's vehicle. 846 F. Supp. at 1476-80.

Relying on *Trimble*, the Court of Appeals concluded that "since Pfeiffer was unaware of the temperature at which hydraulic fluid soaked debris would ignite and was unaware of the operating temperatures of the nearby components he stated were the source of the heat build-up, his opinion was based on speculation and conjecture lacking probative value and should have been rejected." *Dieker*, 30 Kan. App. 2d at 754.

We find, however, that the facts of this case are more akin to those presented in *Farmers Ins. Co. v. Smith*, 219 Kan. 680, 549 P.2d 1026 (1976). There, plaintiffs and their insurers sought to recover damages from the manufacturer of a 3-month-old mobile home after a fire occurred causing extensive damage to the home and its contents. The trial court did not allow plaintiffs' expert witness, a licensed engineer from a consulting firm with a background in electronics and electrical engineering, to testify that the cause of a mobile home fire was a loose connection at or near the breaker box. The expert conducted an investigation which included

an examination of the mobile home, its appliances, and the fire-damaged circuit breaker box. The expert stated that he arrived at his opinion as to the cause of the fire using a process of elimination. The trial court, after conducting a voir dire of the expert, sustained the defendants' objection to the admission of the expert's opinion largely because the expert's opinion was based on inductive reasoning, not on physical evidence. On appeal, this court found that the trial court erred in refusing to permit plaintiffs' expert to present his opinion to the jury, noting that "a cause of action may be proved by circumstantial evidence, and . . . need not . . . exclude . . . every other reasonable conclusion." 219 Kan. at 688-89. In addition, this court concluded:

"We do not find the evidence in this case to be so uncertain or speculative as to justify the action of the trial court in excluding [the expert's] opinion as to the source of the fire. By his elimination of other possible causes for the fire it would appear that his conclusion was reasonable that the fire was the result of some defect in the mobile home's electrical system." 219 Kan. at 690.

Previous Kansas Supreme Court decisions teach that the elements of a products liability action

"may be proved by circumstantial evidence, and such evidence, in order to be sufficient to sustain a verdict of a jury, need not rise to that degree of certainty which will exclude any and every other reasonable conclusion. Proximate causation in a proper case may be shown by circumstantial evidence. [Citation omitted.] It is quite proper to use expert testimony to prove the cause of a fire provided the opinion of the expert is based upon adequate facts and is not based upon evidence which is too uncertain or speculative. [Citations omitted.]" 219 Kan. at 688-89.

Circumstantial evidence can serve as proof of the elements of a theory of liability by a preponderance of the evidence even though other reasonable theories are not excluded by such evidence. *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 53-54, 661 P.2d 348 (1983) (manufacturing defect products liability action).

In *Farmers Ins. Co.*, the expert's background and training was in electronics and electrical engineering, not fire investigation. Despite this fact, the expert was held qualified to testify that a loose connection in the mobile home's electrical system caused the fire that damaged the mobile home. 219 Kan. at 685. After careful consideration of this issue, we find that the trial court did not abuse

its discretion when it allowed Pfeiffer to present his expert opinion to the jury on the cause of the combine fire.

Pfeiffer's opinion did not involve novel scientific theory but, rather, was drawn from known facts, his experience and knowledge of possible causes of fire in a machine, and the use of logic to draw a rational conclusion as to possible causation. The logic of Pfeiffer's opinion was demonstrated by the fact that Case's expert's conclusions were essentially the same as Pfeiffer's, save that Pfeiffer opined that the heat built up under oil soaked chaff, whereas Case's expert believed the heat built up under dry chaff.

Given his educational background and work experience, we find that the testimony given by Pfeiffer was within the scope of his special knowledge, skill, experience, or training. Pfeiffer undoubtedly had the qualifications to testify about a preexisting oil leak, that hydraulic fluid is combustible, that chaff could accumulate in the area of the hydraulic fluid leak, and that heat from mechanical components not allowed to properly dissipate could build up to the point of ignition. The trial court did not abuse its discretion by permitting him to give his opinion concerning a mechanical cause of the fire.

## II. THE COURT OF APPEALS' ORDER DIRECTING ENTRY OF JUDGMENT FOR CASE

Plaintiffs' second assertion of error is that, even assuming the trial court erred by allowing Pfeiffer to testify that the heat buildup under oil soaked chaff caused the fire, the Court of Appeals should have found they had a submissible products liability case without that particular opinion and, thus, should have directed a new trial rather than judgment as a matter of law.

Due to our determination that the trial court did not abuse its discretion by allowing Pfeiffer to present his expert opinion on the cause of the combine fire, it is not necessary for us to fully address this assertion. We affirm the trial court and reverse the Court of Appeals' directive to remand the matter with directions to enter judgment as a matter of law in favor of Case.

## III. SUFFICIENCY OF THE EVIDENCE

As an alternative argument in its response, Case argues that insufficient evidence existed to support the jury's determination that a manufacturing defect existed. This argument was not addressed by the Court of Appeals.

"When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, it is not the function of the appellate court to weigh the evidence or pass on the credibility of the witnesses. If the evidence, with all reasonable inferences to be drawn therefrom, when considered in the light most favorable to the prevailing party, supports the verdict, it will not be disturbed on appeal. [Citation omitted.]" *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 478, 15 P.3d 338 (2000).

Plaintiffs were required to present evidence supporting the elements for a claim of breach of the implied warranty of merchantability. To demonstrate a breach of the implied warranty of merchantability, plaintiff must show that the goods were defective, that the defect was present when the goods left the manufacturer's control, and that the defect caused the injury sustained by plaintiff. See K.S.A. 84-2-314; *Mays*, 233 Kan. at 54; *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, 657 P.2d 517 (1983); *Voelker*, 846 F. Supp. at 1475-76.

"These elements may be proven inferentially, by either direct or circumstantial evidence. For circumstantial evidence to make out a *prima facie* case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective. Because liability in a products liability action cannot be based on mere speculation, guess, or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility." *Mays*, 233 Kan. at 54.

Case contends there was insufficient evidence that the alleged defect existed when the combine left its custody and control. Case argues that the evidence showed that since Case tested each combine's hydraulic system for leaks before it left the factory that plaintiffs' combine had no leaks. In addition, Case maintains that plaintiffs' evidence left gaps in the life of the combine which do not allow the inference they sought.

The testimony established that neither plaintiffs nor anyone from J & W Equipment had performed any maintenance or other

work in the area of the valve body or that involved the fittings, particularly the feeder clutch engagement fitting or the feeder clutch disengagement fitting. Douglas testified that they had operated Case combines since 1990 without ever cleaning out the transmission area on a daily basis, yet had never experienced any fires on other Case combines. The field conditions were wet on the day of the combine fire. Douglas stated that the trail of oil began before the point when he knew of the fire. Moreover, Case concedes that Pfeiffer was qualified to testify as a mechanical engineer that he believed the hydraulic fluid leak began before the fire started and thus, Pfeiffer's testimony established that possibility. Pfeiffer testified there were several possible ways in which a loose fitting could have been just tight enough to pass pressure tests that the manufacturer might have performed but then could have loosened within a relatively short period of use.

Viewed in the light most favorable to plaintiffs, we find that this evidence was sufficient to show that a defect could have existed when the combine left Case's custody and control. Because the evidence supports the jury's verdict, it will not be disturbed on appeal.

Judgment of the Court of Appeals is reversed. Judgment of the district court is affirmed.

ABBOTT and GERNON, JJ., not participating.

LARSON, S.J., and BRAZIL, S.J., assigned.