No. 119,704

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DUANE EDWARD FLAHERTY,
*Appellant*,

v.

CNH INDUSTRIAL AMERICA, LLC,
*Appellee*,

and

STRAUB INTERNATIONAL, INC.,
*Defendant*.

SYLLABUS BY THE COURT

1.

Discovery orders will not be disturbed on appeal in the absence of a clear abuse of discretion.

2.

Evidentiary privileges in the law are not favored because they operate to deny the fact-finder access to relevant information.

3.

Evidentiary privileges are to be strictly construed.

4.

Parties objecting to discovery on the basis of an evidentiary privilege bear the burden of establishing that it applies.

1

5.

The work-product privilege only applies to documents and tangible things. K.S.A. 2018 Supp. 60-226(b)(4)(A).

6.

The non-testifying expert privilege in K.S.A. 2018 Supp. 60-226(b)(5)(D) applies to an in-house expert who has been specially employed in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial.

7.

The party claiming waiver of an evidentiary privilege bears the burden of proof to establish the waiver.

8.

Waiver is the intentional relinquishment of a known right. Intention may be inferred from conduct.

9.

In the case of a corporation, the power to claim or waive a privilege generally rests with corporate management. A corporate employee cannot waive the corporation's privilege.

Appeal from Saline District Court; PAUL J. HICKMAN, judge. Opinion filed June 28, 2019. Affirmed.

*Cynthia J. Sheppeard* and *N. Larry Bork*, of Goodell, Stratton, Edmonds & Palmer LLP, of Topeka, for appellant.

*Patrick A. Edwards*, of Stinson Leonard Street LLP, of Wichita, and *D. Christopher Robinson*, pro hac vice, of Frost Brown Todd LLC, of Louisville, Kentucky, for appellee.

2

Before ARNOLD-BURGER, C.J., HILL, J., and STUTZMAN, S.J.

ARNOLD-BURGER, C.J.: Duane Edward Flaherty brought claims for breach of express and implied warranty against CNH Industrial America, LLC (CNH) after his 2014 Case IH Patriot 2240 Sprayer (Sprayer), manufactured by CNH, caught fire. The district court granted summary judgment to CNH, finding that Flaherty failed to prove that the Sprayer had a defect which caused the fire. Flaherty appealed.

Flaherty makes two arguments on appeal.

First, Flaherty argues that the district court erred in refusing to allow him to depose CNH's in-house expert and employee, Robert Hawken. A party ordinarily may not "discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." K.S.A. 2018 Supp. 60-226(b)(5)(D). Whether an in-house expert like Hawken is "retained or specially employed" is an issue of first impression in Kansas. Because Hawken only inspected the Sprayer at the request of CNH's legal department in anticipation of litigation, we find that CNH specially employed him for the purposes of the privilege. And we find that Flaherty has failed to prove that CNH waived the privilege at any time.

Second, Flaherty argues that he did not have to show specific evidence of a defect in the Sprayer to survive a summary judgment motion and, even if he did, there was enough circumstantial evidence to prove the existence of a defect. We disagree. To prevail on his claims, Flaherty had to show that the Sprayer had a defect. Moreover, while a party may use circumstantial evidence to show a defect, Flaherty does not have enough circumstantial evidence here to prove a defect.

Accordingly, the district court's grant of summary judgment to CNH is affirmed.

3

Flaherty bought the Sprayer from Straub International, Inc. (Straub) in February 2014. CNH manufactured the Sprayer. Straub is an authorized dealer of CNH products. Prior to making the purchase, Flaherty reviewed materials about the Sprayer on CNH's website. He also discussed the Sprayer with Straub sales representative Eric Everhart who told Flaherty "that the Sprayer was a good product that would do what [Flaherty] needed it to do and that Straub would stand behind its product." The Sprayer came with a Warranty and Limitation of Liability Agreement (Warranty Agreement) which provided: "If a defect in material or workmanship is found in a unit and reported during the Warranty Period, [CNH] will pay parts and labor costs to repair the defect if the services are performed by an authorized [CNH] dealer at the dealer's location." A limitations and exclusions provision in the Warranty Agreement stated that the Warranty Agreement contained the entire warranty, and that CNH made no other express or implied warranties.

On September 11, 2014, Flaherty brought the Sprayer to Straub for scheduled maintenance and a spray hose adjustment intended to reinforce the Sprayer's boom supports. Several months earlier, Straub had received a general Product Improvement Program (PIP) bulletin to inspect the routing of 2014 Case IH Patriot 2240 Sprayers, particularly the right-hand side hydrostatic drive hoses at the engine starter to make sure they do not come in contact with the battery terminal on the engine starter. Flaherty left the Sprayer at Straub with the door unlocked and the keys in the ignition. A Straub mechanic was present and aware that the keys were in the Sprayer when Flaherty left. The Sprayer had a full tank of diesel fuel and a full tank of diesel exhaust fluid. The mechanic told Flaherty that he would move the Sprayer into the shop when he was ready to work on it.

Three days later, at 2 a.m. on September 14, 2014, a passerby saw the Sprayer engulfed in flames and reported the fire to the Saline County Sheriff's Office. No one from Straub had interacted with the Sprayer from the time Flaherty dropped it off.

Lieutenant Jeremiah Hays investigated the scene of the fire that night and prepared an incident report. He reported: "At this time, the cause of the fire is unknown. There is no evidence of an arson at this time. It is possible the fire started due to a faulty electrical system."

Captain Jim Hughes went to the scene of the fire the following morning to try to determine the cause of the fire. He reviewed surveillance video from Straub. While there were several cameras, none were directed at the scene of the fire. Hughes observed no foot or vehicle traffic in the two hours preceding the fire. Troy Long, a fire investigator with the Salina Fire Department, accompanied Hughes because Hughes had no fire expertise. But Long was not there in an official capacity and conducted no formal investigation. After inspecting the Sprayer, Long told Hughes that the battery box on the rear left side of the Sprayer was the origin of the fire and he "suspected some type of electrical issue was more than likely the cause."

Flaherty had two experts inspect the Sprayer. David Higday, a certified fire investigator, examined the Sprayer on September 17, 2014. In his report, he opined that the fire originated in the cab of the Sprayer. He could not determine the cause of the fire. He stated: "It is possible there was an electrical short within the cab, although it is a remote possibility. It is also possible that someone intentionally set the cab of the sprayer on fire." He noted that because the cameras were not facing the Sprayer, "[a] person on foot could have gained access to the sprayer without being detected by the security cameras." He discovered that Straub installed the cameras because there had been several incidents of theft on the property. Because of a disability, Higday was unable to continue working on the case. Kent Grier, President and Chief Investigator at Kent Grier Fire

5

Investigations, Inc., reviewed and adopted Higday's opinions. During a deposition, Grier was clear that he was not offering an opinion that a defect in the design or manufacture of the Sprayer caused the fire. He had no evidence to suggest that a defect caused or contributed to the fire.

Ghattas Bitar investigated the scene of the fire on September 22, 2014, on behalf of Flaherty's insurance company. Bitar is a senior technical consultant with Independent Forensic Investigations Corporation. After examining the Sprayer, Bitar concluded that the cause of the fire in the cab was undetermined. He believed it would not be possible to conclusively determine the cause of the fire because of the extent of the damages.

Robert Hawken, a product safety specialist for CNH, investigated the Sprayer over a month later. In an affidavit, Hawken stated that he inspected the Sprayer at the request of CNH's legal department and in anticipation of litigation against CNH.

Flaherty sued CNH and Straub. The suit listed several causes of action, including negligence, strict liability, breach of express warranty, breach of implied warranty of merchantability, failure to warn, violations of the Kansas Consumer Protection Act (KCPA), and negligent misrepresentation. Flaherty designated Grier and Bitar as his expert witnesses. During discovery, Flaherty filed a notice of deposition *duces tecum* informing the other parties of his intention to depose Hawken. CNH replied with a motion to quash and asked the court for a protective order prohibiting Flaherty's discovery of documents and information related to Hawken's inspection of the Sprayer based on two statutory privileges. The district court granted CNH's motion and did not allow Flaherty to depose Hawken. This will be addressed in more detail later.

CNH subsequently moved for summary judgment, mainly arguing that Flaherty failed to prove that a defect in the Sprayer caused the fire. Flaherty settled with Straub while the motion for summary judgment was pending.

6

The district court granted CNH's motion for summary judgment. The court first held that Flaherty's product liability and implied warranty claims failed because Flaherty could not show that a defect in the Sprayer caused the fire. In doing so, the court noted that the Kansas Product Liability Act (KPLA) governed the claims. The purpose of the KPLA, the court held, was "to consolidate all product liability actions into one theory of legal liability." This included Flaherty's claims for negligence, strict liability, implied warranty, and failure to warn. In order for Flaherty to succeed on his defective product claims, he had to prove that the Sprayer was defective. The existence of a defect could not be inferred from the mere fact that the Sprayer was involved in a fire. The court held that Flaherty failed to prove that there was a defect in the Sprayer because Flaherty's experts "were unable to reach a conclusion as to the origin or the cause of the Fire, and neither expert could offer testimony that the Sprayer was defective in any way."

The district court also relied on the economic loss doctrine to reject Flaherty's tort claims. The court explained that this "doctrine precludes buyers of allegedly defective goods from suing under negligence or strict liability theories where the only injury consists of damage to the goods themselves." When a claim is purely for economic loss, the damages are the same as they would be in a contract action. Thus, the court found that "when the actual damages that could be recovered under a tort claim are the same as those that could be recovered for breach of contract, the economic loss doctrine precludes the tort claim."

The district court also rejected Flaherty's express warranty claim. Flaherty argued that express warranties were created by the Warranty Agreement, claims on CNH's website, and statements by a Straub sales representative. But the district court noted that the Warranty Agreement stated that it contained the entire warranty, and that CNH made no other representations or warranties, express or implied. The district court held that the Warranty Agreement controlled, and "where an express warranty provides that a product is free of defect in material and workmanship, the claimant must identify evidence of a

7

defect in the material or workmanship to overcome a motion for summary judgment." As with the previous issue, Flaherty failed to demonstrate that a defect in the material or workmanship of the Sprayer caused the fire.

Finally, the district court rejected Flaherty's claim that CNH violated the KCPA in its Warranty Agreement by excluding, modifying, or limiting the implied warranty of merchantability or fitness. The limitations and exclusions clause did state that it "SPECIFICALLY EXCLUDES THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE." That said, it then acknowledged that some states may not allow such a limitation, and that the stated limitation would not apply if applicable state law did not allow such limitations. Because CNH's implied warranty disclaimer only applied if state law permitted it, and Kansas law does not permit it, the district court held that CNH did not violate the KCPA.

Flaherty appealed.

ANALYSIS

There are three primary issues in this appeal: whether the district court erred in granting summary judgment to CNH on Flaherty's express warranty claims; whether the district court erred in granting summary judgment to CNH on Flaherty's implied warranty claims; and whether the district court erred in prohibiting discovery on Hawken's inspection of the sprayer. Because the discovery issue impacts whether summary judgment was premature here, we will begin with it.

I.      *The district court did not err in granting CNH's motion to quash the notice of depositions* duces tecum *and request for protective order.*

8

*A. We examine the facts giving rise to this claim of error.*

Hawken, a product safety specialist for CNH, examined the Sprayer over a month after the fire and after Flaherty's experts had already inspected it. In an affidavit, Hawken stated that he inspected the Sprayer at the request of CNH's legal department and in anticipation of litigation against CNH. He also said that he only reported his findings to CNH's legal department and outside counsel. However, in Straub's answer to CNH's interrogatory, Straub stated that "[d]uring the post-fire inspection of the Sprayer performed by CNH's representative, CNH's representative told Straub General Manager Bruce Spidle that it was his opinion that the fire started in the starter area, based on what he saw from the pattern of the burn and the damage to the machine."

Flaherty filed a notice of deposition *duces tecum* informing the other parties of his intention to depose Hawken. CNH replied with a motion to quash and asked the court for a protective order prohibiting Flaherty's discovery of documents and information related to Hawken's inspection of the Sprayer. CNH claimed that this information was protected from discovery for two reasons. First, K.S.A. 2018 Supp. 60-226(b)(5)(D) protected information gathered by Hawken because he is a non-testifying expert who prepared his mental impressions and opinions in anticipation of litigation. Second, Hawken's materials and opinions were protected by the work-product doctrine codified at K.S.A. 2018 Supp. 60-226(b)(4)(A) because Hawken inspected the Sprayer at the direction of CNH's in-house counsel and only reported his findings to members of CNH's legal department. Flaherty replied that CNH waived any work-product privilege related to Hawken's inspection and report because Hawken disclosed his opinions to Spidle. Flaherty added that CNH had waived any consulting expert privilege under K.S.A. 2018 Supp. 60-226(b)(5) in two ways: First, Hawken's disclosure of his opinions to Spidle, and second, by having Hawken sign its interrogatory answers. After a telephonic hearing in which the parties presented oral argument, the district court granted CNH's motion for the reasons provided in CNH's motion (work-product privilege and non-testifying witness privilege)

9

and did not allow Flaherty to depose Hawken, nor serve him with a subpoena *duces tecum*.

Flaherty challenges both grounds of the order. If we find the district court erred in prohibiting discovery, then summary judgment would be premature, and we would need to remand the case for further discovery. So we begin with this claim of error.

### B. *Our standard of review for discovery error is abuse of discretion.*

"[A] trial court is vested with broad discretion in supervising the course and scope of discovery." *Miller v. Johnson*, 295 Kan. 636, 688, 289 P.3d 1098 (2012). "[O]rders concerning discovery will not be disturbed on appeal in the absence of a clear abuse of discretion." *In re Tax Appeal of City of Wichita*, 277 Kan. 487, 513, 86 P.3d 513 (2004). A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the trial court; (2) it is based on an error of law; or (3) it is based on an error of fact. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015).

### C. *Privileges in the law must be strictly construed.*

"Privileges in the law are not favored because they operate to deny the factfinder access to relevant information." *Adams v. St. Francis Regional Med. Center*, 264 Kan. 144, Syl. ¶ 3, 955 P.2d 1169 (1998). "Because they are exceptions to the general rule that parties may obtain discovery regarding any matter that is relevant to a party's claim or defense, evidentiary privileges are to be strictly construed." *Rockhill Pain Specialists v. Hancock*, 55 Kan. App. 2d 161, Syl. ¶ 7, 412 P.3d 1008 (2017). But as Justice Powell wrote in *United States v. Nobles*, 422 U.S. 225, 237, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975):

"In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference."

He went on to point out that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial." 422 U.S. at 238. Thus, we have two statutory privileges in Kansas that seek to protect this information from disclosure so that an attorney can properly represent his or her client: the work-product privilege and the non-testifying expert privilege. Parties objecting to discovery based on an evidentiary privilege bear the burden of establishing that it applies. *Cypress Media, Inc. v. City of Overland Park*, 268 Kan. 407, 425, 997 P.2d 681 (2000).

We will explain the application of each in turn.

> D. *The work-product privilege protected the disclosure of any documents or tangible things Hawken produced in anticipation of litigation.*

The work-product privilege protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative, including the other party's attorney, consultant, surety, indemnitor, insurer or agent." K.S.A. 2018 Supp. 60-226(b)(4)(A). There is an exception when a "party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." K.S.A. 2018 Supp. 60-226(b)(4)(A)(ii). But Flaherty does not assert that this exception applies.

The work-product privilege only applies to "documents and tangible things." K.S.A. 2018 Supp. 60-226(b)(4)(A). Thus, as Flaherty notes, it would not "apply to testimony about [Hawken's] inspection, what he told Spidle, the basis for what he said, or

11

whether the statements Spidle attributes to him are correct." To the extent the district court relied on the work-product privilege to prohibit Hawken's statements about his investigation, this was error. But the privilege clearly extends to any documents or tangible things that would have been the subject of the requested subpoena *duces tecum*.

Yet Flaherty argues that the privilege does not apply to any documents or tangible things prepared by Hawken because CNH's legal department did not supervise their preparation in anticipation of litigation. But Hawken submitted an affidavit stating that he inspected the Sprayer in anticipation of litigation. We find that it was not an abuse of discretion for the district court to accept this testimony. As CNH notes, Flaherty had already had two of his own experts inspect the Sprayer *before* Hawken's inspection. It was reasonable for CNH to anticipate litigation in this scenario.

While the work-product privilege does not protect oral testimony from Hawken, it does protect any documents or tangible things he prepared for CNH and the district court did not abuse its discretion in so finding.

E. *The non-testifying expert privilege in K.S.A. 2018 Supp. 60-226(b)(5)(D) applies to in-house experts like Hawken.*

Flaherty next asserts that the non-testifying expert exception to discovery does not protect Hawken's findings. It provides:

> "*Expert employed only for trial preparation*. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." K.S.A. 2018 Supp. 60-226(b)(5)(D).

There are a couple of exceptions to this general rule, but Flaherty does not argue that they apply here. See K.S.A. 2018 Supp. 60-226(b)(5)(D)(i)-(ii). The issue is whether Hawken qualifies as an expert employed only for trial preparation. If so, his opinions and reports are privileged and not subject to disclosure as part of discovery.

This issue requires interpretation of the language in K.S.A. 2018 Supp. 60-226(b)(5)(D). Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

Both parties acknowledge that Hawken is a CNH employee. They dispute whether an in-house expert like Hawken qualifies for the non-testifying expert privilege. Flaherty argues that because CNH employs Hawken as a product safety specialist, he was not "retained or specially employed" to prepare for the case. CNH argues that the privilege attaches to Hawken because he was not "involved in the factual underpinnings of this matter and was asked to inspect the fire scene by CNH's in-house counsel." When CNH's counsel "designated and assigned [Hawken] to apply his expertise to this specific matter in anticipation of litigation" Hawken became specially employed to investigate the fire.

Whether the non-testifying expert privilege applies to in-house experts is an issue of first impression in Kansas. That said, Kansas' privilege is much like that in the Federal Rules of Civil Procedure. The federal rule provides:

> "*Expert Employed Only for Trial Preparation*. Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Fed. R. Civ. Proc. 26(b)(4)(D) (prior to 2010 known as 26[b][4][B]).

13

"The [federal] rule is designed to promote fairness by precluding unreasonable access to an opposing party's diligent trial preparation." *Durflinger v. Artiles*, 727 F.2d 888, 891 (10th Cir. 1984). Both parties cite federal caselaw applying the rule to in-house experts. And both can find support for their respective interpretations.

Federal judges have recognized that "[t]he concept of an *in-house*, non-testifying expert witness is not specifically addressed under Rule 26." *ZCT Systems Group, Inc. v. FlightSafety Intern.*, No. 08-cv-447-JHP-PJC, 2010 WL 1257824, at *3 (N.D. Okla. 2010) (unpublished opinion). One federal judge noted that "[a] number of courts have found that in-house experts never fall within the ambit of Rule 26(b)(4)(D)." *Hartsock v. Goodyear Dunlop Tires North America LTD*, No. 2:13-cv -00419-PMD, 2014 WL 11022097, at *3 (D.S.C. 2014) (unpublished opinion). But the judge acknowledged that other courts "have recognized instances where an in-house expert can be considered 'specially employed in anticipation of litigation' and thus fall within the protection of the rule." 2014 WL 11022097, at *3. In their treatise on federal practice and procedure, Wright and Miller noted that "[i]t may be that no parsing of the rule and Advisory Committee Note will afford a fully satisfactory answer to that question." 8A Wright & Miller, Federal Practice and Procedure: Civil § 2033 (3d ed. 2010). But the question has arisen and thus this court must address it.

Flaherty's suggestion that the rule does not cover in-house experts finds support from the Federal District Court for the Eastern District of Virginia in *Virginia Electric & Pow. Co. v. Sun Shipbuilding & D. D. Co.*, 68 F.R.D. 397 (E.D. Va. 1975). There, the court observed that an expert is someone who can "'see all sides of a subject.'" 68 F.R.D. at 406 (quoting Black's Law Dictionary [4th ed. 1951]). An expert is "expected to owe his allegiance to his calling and not to the party employing him. In order to be an expert one must be in a position to testify as an expert and not as a partisan." 68 F.R.D. at 406. The defendant argued Rule 26(b)(4) should apply to an expert who was already employed by a business who then assigns said employee to work on the matter at issue. But as the

court noted, that interpretation of the rule would "not take into account the fact that an expert should be impartial, should owe his allegiance to his calling, should not be a partisan and should be able to 'see all sides' of the issue." 68 F.R.D. at 407. The court added that "[a] regular employee, assigned as an expert, meets none of these prerequisites." 68 F.R.D. at 407.

The court went on to say that "'specially employed'" refers only to situations in which the expert is "put on the payroll for the specific purpose of deriving facts and opinions for use in trial preparation or anticipated litigation." 68 F.R.D. at 407. But the term *specially employed* troubled the court. The court reasoned the term created two possible distinctions between employee experts: "(1) an expert 'who is simply a general employee,' and (2) an expert who *was* simply a general employee but who has been specially assigned to the case." 68 F.R.D. at 407-08. That said, the court held that the repetition of the term added nothing to its meaning. The court held that the term "merely covers instances of employment of an expert for purposes of the specific litigation." 68 F.R.D. at 408. The court found that an in-house expert should be treated, "for purposes of discovery, as an ordinary witness." 68 F.R.D. at 408.

CNH's suggestion that the rule does cover in-house experts finds support in several cases.

First, in a case that arose after an explosion at a Shell Oil refinery, the Federal District Court for the Eastern District of Louisiana found two Shell employees met the definition of non-testifying experts under the rule. *In re Shell Oil Refinery*, 132 F.R.D. 437, 442 (E.D. La. 1990). At the request of Shell's legal counsel and in anticipation of litigation, two Shell employees (R.E. Nordstrom and Paul A. Nelson) performed tests on material removed from the explosion site. The plaintiffs sought to depose Nordstrom and Nelson. Shell objected, asserting that Nordstrom and Nelson were non-testifying experts and protected by the non-testifying expert privilege. The plaintiffs argued that Nordstrom

and Nelson "should be treated as ordinary witnesses under Fed. R. Civ. P. 26(b)(1) because they are in-house experts who would have performed the tests in question as part of their regular duties regardless of litigation." 132 F.R.D. at 441. The federal court had to determine whether Nordstrom and Nelson were "retained or specially employed" within the meaning of the rule:

> "[T]he persuasive authority favors application of Rule 26(b)(4)(B) to non-testifying in-house experts. To rule otherwise would encourage economic waste by requiring an employer to hire independent experts to obtain the protection of Rule 26(b)(4). Protection of an in-house expert's opinion's [sic] supports improved public safety and other social benefits of self-analysis. That the work of an in-house expert is used not only to defend a lawsuit but also to improve a company's operations or product design does not remove him from the parameters of Rule 26(b)(4)(B).

> "Not all in-house experts fall within the parameters of the retained or specially employed language of Rule 26(b)(4)(B). The Advisory Committee Notes exclude from the scope of Rule 26(b)(4)(B) 'an expert who is simply a general employee of the party not specially employed on the case.' Those in-house experts who are not retained or specially employed should be treated as ordinary witnesses under Rule 26(b)(1), and if their work was in anticipation of litigation or preparation of trial, then discovery must be analyzed under the work product doctrine, Rule 26(b)(3).

> "Neither the Rule nor the Notes explain when a general employee may become retained or specially employed. Some courts have found that the terms retained or specially employed mean 'something more than simply the assignment of a current employee to a particular problem raised by current litigation.' *See Kansas-Nebraska Natural Gas Co., Inc.*, 109 F.R.D. at 16. To the contrary, other authority suggests that 'a regular employee may become specially employed when he is designated and assigned by a party to apply his expertise to a particular matter in anticipation of litigation or for trial.' *See* Pielemeier, *Discovery of Non-Testifying In-House Experts*, 58 Ind.L.J. at 605 (citing Graham, *Discovery of Experts Under Rule 26(b)(4)*, 1976 U.Ill.L.F. note 3, at 942.)" 132 F.R.D. at 441-42.

The court decided that "[w]hether an in-house expert is retained or specially employed must be decided case-by-case." 132 F.R.D. at 442. It then held that Shell's employees "were retained or specially employed by Shell in preparation for trial." 132 F.R.D. at 442. It reasoned:

"Shell's attorneys engaged Nordstrom and Nelson to perform specific tasks to help them defend the lawsuit. At the direction of Shell's legal department and outside counsel, Nordstrom and Nelson investigated and studied the cause of the explosion, and prepared preliminary reports. Copies of the reports were sent only to Shell's outside counsel. Although Nordstrom and Nelson might have studied the cause of the explosion regardless of litigation, their usual duties do not include litigation assistance. That Nordstrom and Nelson were not paid additional compensation or assigned exclusively to the litigation is not conclusive. An in-house expert may be specially employed without additional compensation or an exclusive assignment." 132 F.R.D. at 442.

Second, the Federal District Court for the District of Kansas reached a similar result in *Seiffer v. Topsy's International, Inc.*, 69 F.R.D. 69 (D. Kan. 1975). There, defendant Touche, Ross, & Company moved for a protective order for the deposition of John Van Camp. Van Camp was a partner at Touche. Touche argued that Van Camp qualified as an expert who was retained or specially employed in anticipation under Rule 26(b)(4)(B) and that it did not intend to call Van Camp as a witness at trial. The defendant underwriters in the case argued that Van Camp was clearly deposable because he worked for Touche.

The district court held that Van Camp was "'specially employed'" for the purposes of the privilege based on the facts of the case. 69 F.R.D. at 72. The court first focused on the fact that Touche's law firm specifically requested that Van Camp assist in potential litigation arising out of Touche's audits of the plaintiff's engagements. Second, Van Camp was not involved in the audits. Third, Van Camp only revealed his report to Touche's legal counsel. Finally, Van Camp would not be called as a witness at trial. Noting the

17

policies underlying discovery and privileges, the court reasoned that "[w]hile facts are not to be hidden, nor necessary discovery improperly obstructed, neither is a party allowed to delve at will into an expert mind solely to sustain its own burden of preparing for litigation." 69 F.R.D. at 72.

Finally, the court in *Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 387 (N.D. Ill. 2012), performed an in-depth analysis of the issue but refused to determine whether an in-house expert was "'specially employed'" for the purposes of the rule because the evidence was clear that the employees had not been working in anticipation of litigation. Yet the court's review of the caselaw is informative. The court noted that cases holding that an in-house expert could never be "'retained or specially employed'" did so for three reasons: "the definition of an expert, the (supposedly) plain language of Rule 26(b)(4), and the accompanying Advisory Committee Notes." 283 F.R.D. at 384 (citing *Matter of Kegg*, 116 F.R.D. 643 [N.D. Ohio 1987]; *United States v. 22.80 Acres of Land*, 107 F.R.D. 20 [N.D. Cal. 1985]; *Kansas-Nebraska Natural Gas v. Manhattan Oil Co.*, 109 F.R.D. 12 [D. Neb. 1983]; *Virginia Electric*, 68 F.R.D. 397).

Despite the cases finding otherwise, the *Tellabs* court found that "the text and structure of the Rule and the Advisory Committee Note are indeed susceptible of an interpretation that supports a result contrary to those cases that have concluded that in-house experts are not within the scope of the Rule." 283 F.R.D. at 385.

> "If in-house experts were intended to have been excluded, one would have expected the Rule to have ended with the words 'who have been specially retained.' In common parlance, employees already on the job are not specially *retained,* no matter what the task. The addition of the words, 'or specially *employed*,' presumably was intended to signal a broader scope. To exclude in-house employees from the ambit of the Rule is effectively to read out the phrase 'specially employed.' But that would contradict of the basic principle that statutes should be construed to give effect to each word." 283 F.R.D. at 385.

The court also found that the Advisory Committee Note supported the idea that in-house experts could be protected by the privilege:

> "The impression that in-house experts are within the intended scope of the Rule is further bolstered by the phrasing of the Advisory Committee Note, which, immediately after stating that the Rule deals with an expert who has been retained or specially employed by the party in anticipation of litigation or preparation for trial includes the following parenthetical: '(thus excluding an expert who is simply a general employee of the party *not specially employed on the case*).' (Emphasis supplied). If in-house experts were intended to be excluded under the Rule, the Advisory Committee Note would have ended with the words 'general employee of the party.' There would have been no need to add the qualifier 'not specially employed on the case.' Adding that phrase denotes that a 'general employee of the party' is protected if specially employed on the case, but not otherwise. In short, while the Advisory Committee Note is perhaps not decisive, its explanation goes far to support an interpretation of the Rule that in-house experts are within the ambit of the Rule if specially employed to perform a task in anticipation of litigation." 283 F.R.D. at 385.

The *Tellabs* court also rejected the *Virginia Electric* court's reasoning that experts must be impartial, and employees are not impartial. 283 F.R.D. at 385. The court called this "a questionable basis for narrow interpretation of Rule 26(b)(4)(D)." 283 F.R.D. at 385. The court added that "[t]he premise that an expert is by nature impartial is based on either an incorrect *a priori* assumption that bitter experience has long since proven to be false or a dubious dictionary definition of 'expert' as one who possesses not only expertise but impartiality as well." 283 F.R.D. at 385.

We find that the non-testifying expert privilege in K.S.A. 2018 Supp. 60-226(b)(5)(D) applies to in-house experts like Hawken. As explained by the *Tellabs* court, the reasoning of courts that refuse to apply the privilege in this situation is not persuasive. First, as the *Tellabs* court explained, the *Virginia Electric* court's definition of expert is a questionable basis for deciding this issue. *Tellabs*, 283 F.R.D. at 385. *Virginia Electric*

19

suggested that employees cannot be impartial. The court implied that employees would lie or conceal facts unfavorable to their employer out of loyalty. See *Virginia Electric*, 68 F.R.D. at 407. But nothing guarantees that an expert will be impartial, just as nothing guarantees that an employee will be dishonest when asked to investigate an issue in anticipation of litigation.

Second, while some courts like *Virginia Electric* rely on the Advisory Committee's Notes, the Notes are not conclusive on the subject. As noted in *Tellabs*, the Advisory Committee Notes state that the Rule excludes experts who are simply general employees of a party and not specially employed. *Tellabs*, 283 F.R.D. at 385. By adding the phrase "not specially employed," the drafters of the Advisory Committee Notes may have intended to provide the privilege to general employees when they are specially employed. 283 F.R.D. at 385. That said, Kansas did not adopt the Advisory Committee's Notes and they are not directly relevant to determining the intent of the Kansas Legislature. While they may be useful in divining the intent of the persons who drafted the Federal Rules of Civil Procedure, Kansas has its own rules for interpreting statutes.

Two of these rules of statutory interpretation are important in deciding this issue. An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). And, Kansas courts presume the Legislature does not intend to enact meaningless legislation. *In re Marriage of Traster*, 301 Kan. 88, 98, 339 P.3d 778 (2014). K.S.A. 2018 Supp. 60-226(b)(5)(D) covers experts who are "retained" or "specially employed." The use of the term "employed" suggests that the Legislature intended to cover employees of a party. If it did not intend to cover employees, then the Legislature could have limited application of the rule only to retained experts.

20

The rule does not cover all employees—they must be "specially" employed. Courts applying the rule to in-house experts have only applied the privilege to employees who are working on a project they would not normally be working on. See *Tellabs*, 283 F.R.D. at 387. The *Shell Oil* court found that Nordstrom and Nelson were "specially employed" by Shell. 132 F.R.D. at 442. The employees only investigated the explosion at the request of Shell's attorneys. Even though "Nordstrom and Nelson might have studied the cause of the explosion regardless of litigation, their usual duties do not include litigation assistance." 132 F.R.D. at 442. Similarly, in *Seiffer*, the court noted that the partner was not involved in the facts giving rise to the litigation and only assisted in preparing for the litigation at the request of Touche's law firm. 69 F.R.D. at 72. In both cases, the employees only reported their findings to their employers' legal counsel. *Shell Oil*, 132 F.R.D. at 442; *Seiffer*, 69 F.R.D. at 72.

Here, Hawken's affidavit reveals that he investigated the Sprayer at the request of CNH's legal department in anticipation of litigation and only reported his findings to CNH's legal department. This makes his situation analogous to the employees in *Shell Oil* and *Seiffer*. In this scenario, we find that facts known or opinions held by Hawken are privileged under K.S.A. 2018 Supp. 60-226(b)(5)(D).

There remains the issue of whether Hawken waived this privilege, and we will next address waiver as to both privileges asserted by CNH.

### F. We examine waiver, in general.

The party claiming waiver of an evidentiary privilege bears the burden of proof to establish the waiver. *Lindley v. Life Investors Ins. Co. of America*, 267 F.R.D. 382, 394 (N.D. Okla.) (noting majority view is that the party claiming waiver has the burden of proof on that issue), *aff'd in part as modified*, No. 08-CV-0379-CVE-PJC, 2010 WL 1741407 (N.D. Okla. 2010) (unpublished opinion); *Rhoads Industries v. Building*

21

*Materials Corp.*, 254 F.R.D. 216, 223 (E.D. Pa.) (party claiming waiver has the burden of proof as to waiver), *order clarified* 254 F.R.D. 238 (E.D. Pa. 2008); *Johnson v. Gmeinder*, 191 F.R.D. 638, 643 (D. Kan. 2000) (party asserting waiver of work-product immunity, rather than the party asserting the work-product protection, should have the burden to establish waiver); *Carmona v. State*, 941 S.W.2d 949, 953 (Tex. Crim. App. 1997) ("party seeking to benefit by a finding of waiver has the burden of going forward with evidence that supports a finding of waiver"). Waiver is described as the "intentional relinquishment or abandonment of a known right." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 1461 (1938). Intention may be inferred from conduct. *Foundation Property Investments v. CTP*, 286 Kan. 597, 609, 186 P.3d 766 (2008). "Relinquishment" is defined as "[t]he abandonment of a right or thing." Black's Law Dictionary 1482 (10th ed. 2014).

Waiver of privilege is governed by K.S.A. 60-437. The relevant portion of this statute provides:

> "A person who would otherwise have a privilege to refuse to disclose or to prevent another from disclosing a specified matter has no such privilege with respect to that matter if the judge finds that such person or any other person while the holder of the privilege has . . . without coercion, or without any trickery, deception, or fraud practiced against him or her, and with knowledge of the privilege, made disclosure of any part of the matter or consented to such a disclosure made by anyone." K.S.A. 60-437.

There is no similar all-inclusive waiver provision under federal law. Given that, some federal courts have concluded that the non-testifying expert provisions of Fed. R. Civ. Proc. 26(b)(4)(D) are not subject to waiver at all. See *Ludwig v. Pilkington North America, Inc.*, No. 03 C 1086, 2003 WL 22242224, at *3 (N.D. Ill. 2003) (unpublished opinion) (finding that when a party enjoys protection under Rule 26[b][4][B], the protection is not subject to waiver); *Vanguard Sav. and Loan Ass'n, VSL Service Corp. v. Banks*, No. CIV. A. 93-4627, 1995 WL 71293, at *2 (E.D. Pa. 1995) (unpublished

opinion) (finding, after non-testifying expert disclosed report to third party, it was irrelevant whether expert violated work-product privilege because he still had a non-testifying expert privilege that was not subject to waiver).

Other federal courts have suggested, however, that the protections afforded by Rule 26(b)(4)(D), prior to 2010 known as Rule 26(b)(4)(B), can be waived. In *Hartford Fire Ins. v. Pure Air On The Lake Ltd.,* 154 F.R.D. 202 (N.D. Ind. 1993), the court considered whether the defendant waived the protections of Rule 26(b)(4)(B) by issuing a short press release concerning its non-testifying expert's conclusions. The court held that "[a]rguably, the protections afforded under Federal Rule of Civil Procedure 26(b)(4)(B) are waivable." 154 F.R.D. at 211. The court noted that generally waiver of a privilege occurs when actions taken by the holder make it unfair to insist that the privilege remains intact. The court also stated that courts have found a waiver when the holder of a privilege "'voluntarily discloses . . . any significant part of the privileged matter.'" 154 F.R.D. at 211. The court found that no waiver occurred because the "minuscule" disclosure in the press release did not make it unfair to insist that the protection remained. 154 F.R.D. at 211. The court also found that the disclosure did not constitute a significant portion of the privileged material because the defendant did not "begin to recite all of [the expert's] studies, factual findings or conclusions." 154 F.R.D. at 211.

Finally, even where a federal court finds that a party waived protections afforded by Rule 26(b)(4)(D), the waiver may be limited in scope. *Hollinger Intern. Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 521-22 (N.D. Ill. 2005). In *Hollinger,* the court found that when the plaintiff disclosed part of its expert's findings, it only waived the protections of Rule 26(b)(4)(B) as to the items actually disclosed. The court found that the partial disclosure of the non-testifying expert's findings "did not automatically forfeit the protection of Rule 26(b)(4)(B) as to the withheld information or place the entirety of his work at issue." 230 F.R.D. at 522.

23

With these general principles in mind we move on to Flaherty's claims of waiver here.

### G. Flaherty has failed to establish that CNH waived the work product or the non-testifying expert privileges.

Flaherty contends that even if Hawken's investigation was protected by an evidentiary privilege, CNH waived the privilege in two key ways:  by having Hawken verify its interrogatory answers, and by Hawken's alleged disclosure of his findings to Spidle. But, after a careful review of these facts and the relevant caselaw, we find that Flaherty's claim of waiver fails for three reasons.

For each, we assume for purposes of our analysis that Hawken made the statements attributed to him by Spidle although we understand that fact is in dispute, with an affidavit from Hawken revealing that he disclosed his opinions only to the CNH legal team, and Straub's response to interrogatories that Hawken told Spidle that he had concluded that the fire started in the starter area. Because the district court did not issue a written order and there is no transcript of the telephonic hearing, it is impossible to determine how the court dealt with this conflicting evidence in finding the privileges had not been waived. In the end, it makes no difference in our analysis, so we will simply assume that Hawken made the statement that Spidle attributes to him.

### (1) Hawken could not waive the privilege on behalf of CNH.

In the case of a corporation, the power to claim or waive a privilege generally rests with corporate management—ultimately with the officers and board of directors. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348, 105 S. Ct. 1986, 85 L. Ed. 2d 372 (1985); *United States v. Hooker Chemicals & Plastics Corp.,* 112 F.R.D. 333, 338 (W.D.N.Y. 1986) (finding no waiver occurred because only the holder of

24

the privilege related to non-testifying experts, the defendant, could waive the protections). A corporate employee cannot waive the corporation's privilege. *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1371 (10th Cir. 1997). Here, the client was CNH, and CNH retained the privilege against disclosing information gathered from its non-testifying expert employee. Hawken, a nonlawyer CNH employee, could not waive that privilege on behalf of the corporation, and Flaherty presents no evidence that CNH consented to any of Hawken's disclosures to Spidle. Moreover, the statement made by Hawken was in October 2014, after Flaherty's own experts had examined the Sprayer. When CNH replied to interrogatories submitted to it during discovery by Flaherty—in which he asked about any inspections CNH conducted on the Sprayer—CNH asserted both the work-product privilege and the non-testifying expert privilege. This shows that CNH had no intention of waiving those privileges. There must be a distinct and unequivocal waiver to authorize the disclosure of privileged communications. *Novak v. Chicago Fraternal Life Ass'n*, 136 Kan. 609, 612, 16 P.2d 507 (1932).

> *(2) Hawken's verification of the interrogatory answers on behalf of CNH did not constitute a waiver of the work-product privilege or the non-testifying expert privilege.*

If a party to a lawsuit is a corporation, interrogatories directed to the corporation must be answered "by any officer or agent, who must furnish the information available to the party." K.S.A. 2018 Supp. 60-233(b)(1)(B). As an employee of CNH, there was nothing irregular about Hawken answering the interrogatories directed to CNH. We fail to see how the mere verification of answers to interrogatories waived the statutory privileges, and Flaherty cites no caselaw to directly support his claim. This does not seem at all unusual or untoward for a CNH employee who is on the litigation team in the case. Hawken did not disclose or authenticate any facts or opinions he compiled related to the cause of the fire. In his role as a CNH employee authorized to answer the interrogatories, he verified that the responses were not all within his personal knowledge but that no one

employee had personal knowledge of all the interrogatory answers. He stated the answers had been compiled by CNH employees who have informed him that the answers were correct.

In sum, we do not find that the district judge abused his discretion in finding that Hawken did not waive any of CNH's statutory privileges.

*(3) Even if the district court erred by denying Flaherty the opportunity to depose Hawken, the error was harmless.*

Even if the district court erred by denying Flaherty the opportunity to depose Hawken, the error was harmless. "Harmless error is error which does not prejudice the substantial rights of a party. It affords no basis for a reversal of a judgment and must be disregarded." *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986); see also K.S.A. 2018 Supp. 60-261 (court to disregard errors that do not affect substantial rights).

If Hawken waived the privilege by talking to Spidle, Flaherty would only be able to discover the contents of that conversation. The waiver statute provides that a person who discloses a privileged matter to a third-party no longer has a privilege in that "specified matter." K.S.A. 60-437. It does not provide that the privilege is waived as to matters not discussed with the third party. Even if Hawken's conversation with Spidle were discoverable, the facts divulged by Hawken would not help Flaherty succeed in his case. As will be explained below, Flaherty needed to prove that the Sprayer had a defect to succeed on his express and implied warranty claims. Hawken did not tell Spidle that he believed there was a defect.

That said, Flaherty asserts that Hawken's statements to Spidle strengthen his implied warranty of merchantability claim by adding to the circumstantial evidence that

26

an electrical fault in the Sprayer caused the fire. He asserts that "it directly supports the possibility that the Fire may have begun in the starter area, in agreement with Bitar's documented observation that, when he inspected the machine, there was a break in an energized cable between the starter and the alternator." Flaherty adds that Hawken's statements also support "the possibility the fire started as a result of contact between exposed steel braids in a hydrostatic cable and battery terminals on the starter, as contemplated in the PIP." Contrary to Flaherty's assertion, the possibility that the fire began in the starter area is unsupported by Bitar's report. Bitar traced the cables from the battery to the starter and found them to be in good shape with no signs of electrical activity. And, as will be discussed later, the district court found that the PIP was inadmissible as evidence of a defect because none of Flaherty's experts had established a causal relationship between the fire and the PIP.

As discussed above, none of the experts here determined that the Sprayer had a defect. Even though his own experts would not opine on the existence of a defect, Flaherty asks this court to speculate that a defect existed based on select portions of the expert reports. Speculation is not a basis for liability. "Because liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility." *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 54, 661 P.2d 348 (1983). Even if the district court had allowed Flaherty to depose Hawken, there is no indication that Hawken would have identified an actionable defect in the Sprayer. At most, his testimony would add to the already varied possibilities and speculation on the cause of the fire.

Finally, any erroneous application of the work product or non-testifying expert privileges did not deny Flaherty access to information vital to his claim. His experts examined the Sprayer over a month before Hawken. They had access to all the same information Hawken's did regarding external observations of the unit. The information disclosed was available from other sources, including Flaherty's own hired experts.

27

Finding no error in the granting of a protective order regarding Hawken, we next turn to the appropriateness of the granting of CNH's summary judgment motion.

II.    *The district court did not err in granting summary judgment to CNH on Flaherty's express and implied warranty claims.*

Flaherty argues that the district court erred in granting summary judgment on his express and implied warranty claims.

   A.  *Our standard of review is de novo.*

In an appeal from the district court's ruling on a summary judgment motion, we consider the motion de novo and apply the same standards which the district court applied. We owe no deference to the district court decision or rationale. *Cady v. Schroll*, 298 Kan. 731, 734, 317 P.3d 90 (2014).

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. K.S.A. 2018 Supp. 60-256(c)(2). Any court considering the motion must resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the summary judgment motion is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. To preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. The court must deny a motion for summary judgment if reasonable minds could differ over the conclusions drawn from the evidence. See *Armstrong v. Bromley Quarry & Asphalt, Inc.*, 305 Kan. 16, 24, 378 P.3d 1090 (2016).

28

*B. The district court denied Flaherty's express and implied warranty claims.*

Flaherty brought claims for breach of both express and implied warranties. He alleged that CNH made three express warranties. One arose from the text of the Warranty Agreement. The other two were based on "descriptions on the CNH . . . website and the representations by Straub's salesman, Everhart, that the Sprayer was a good product and it would do what Plaintiff needed it to do." Flaherty also argued that the UCC created an implied warranty of merchantability applicable to the Sprayer.

The district court held that the only express warranty applicable to the case was the one in the Warranty Agreement. It denied Flaherty's other express warranty argument because the written warranty "disclaim[ed] any express warranty created by CNH's generic descriptions of the Sprayer on its website and/or alleged statements by a Straub salesman." The district court then denied the express and implied warranties because Flaherty failed to prove that a defect in the Sprayer caused the fire. The issues we must determine are: (1) Did the Warranty Agreement disclaim any express warranties that may have arisen out of descriptions of the product; and (2) do the warranties that applied to the Sprayer require Flaherty to prove that the Sprayer had a defect? If the answer to the second question is yes, then we must determine whether Flaherty provided sufficient evidence of a defect to survive summary judgment.

*C. The Warranty Agreement disclaimed any express warranty created by descriptions of the Sprayer on its website or by statements made by the sales representative.*

The Warranty Agreement provided: "If a defect in material or workmanship is found in a unit and reported during the Warranty Period, [CNH] will pay parts and labor

29

costs to repair the defect if the services are performed by an authorized [CNH] dealer at the dealer's location." A limitations and exclusions clause further provided:

> **"THIS DOCUMENT CONTAINS THE ENTIRE [CNH] WARRANTY. [CNH] MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, AND SPECIFICALLY EXCLUDES THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PARTICULAR PURPOSE.\* [CNH] WILL NOT BE LIABLE FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES RESULTING FROM A BREACH OF THE WRITTEN WARRANTY OR ANY IMPLIED WARRANTY IMPOSED BY LAW.\***
>
> \*These limitations and exclusions may not be allowed by some states or provinces, and they shall not apply to the extent such limitations or exclusions are not allowed by applicable state/provincial law."

Flaherty argues that this Warranty Agreement did not disclaim any express warranties created by CNH's website or statements made by the Straub sales representative. The first issue is determining whether the descriptions of the Sprayer on the website or the claims by Straub's sales representative created express warranties. If they do, then the next issue is determining whether the Warranty Agreement disclaimed them.

### *(1) Flaherty fails to identify any specific descriptions of the Sprayer on the website or in written materials he was provided upon which he relied.*

Under Kansas' UCC, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." K.S.A. 84-2-313(1)(b). "It is not necessary to the creation of an express warranty that the seller use formal words such as 'warrant' or 'guarantee' or that he have a specific intention to make a warranty," however, "an affirmation merely of the value of

the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." K.S.A. 84-2-313(2).

CNH argues that Flaherty failed to identify specific factual representations from its website that he relied on in purchasing the Sprayer. In his response to CNH's motion for summary judgment, Flaherty alleged that he "reviewed materials about the Sprayer on CNH's website." He cited his own deposition testimony in support of this statement. In the deposition, CNH asked Flaherty "What marketing materials did you review in the decision-making process to buy this sprayer?" He replied, "There might have been some flyers and brochures out by then." He also looked at pictures of the Sprayer on CNH's website. But he did not have the flyers or brochures that he looked at, nor did he have any specific details of what he saw on the website. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. Without knowing what claims CNH made about the product on its website, this court cannot determine whether they created an express warranty. Flaherty's failure to prove the facts relevant to this claim precludes this court, as it did the district court, from finding that an express warranty arose from representations on brochures and on the website.

*(2) Comments by the sales representative were merely expressions of opinion and created no express warranty.*

Flaherty also contends that an express warranty was created when a Straub sales representative told him "that the Sprayer was a good product that would do what I needed it to do and that Straub would stand behind its product." CNH argues that this comment was merely an expression of opinion and created no express warranty. We agree.

"A seller's oral representation may constitute an express warranty." *Golden v. Den-Mat Corporation*, 47 Kan. App. 2d 450, 482, 276 P.3d 773 (2012). But a "general,

31

though unquantifiable, expression[] of quality or superiority cannot form the basis of an express warranty." 47 Kan. App. 2d at 482. For example, "[a] seller's representations that goods are 'first rate' or 'the finest around' are examples of sales talk or puffing that would not create an express warranty." 47 Kan. App. 2d at 482. Here, the seller's statement constitutes a mere opinion and created no express warranty. The portion of the statement that the Sprayer is a "good product" is an expression of quality. The portion of the statement that the Sprayer would "do what [Flaherty] needed it to do" is a general, unquantifiable statement given the facts before this court. If Flaherty had provided evidence that the sales representative promised that the Sprayer would perform some specific function, and the Sprayer did not perform that specific function, than Flaherty would have a better case.

"The line which separates a case of mere puffing and commendation from an affirmation of a fact is sometimes indefinite." *Topeka Mill & Elevator Co. v. Triplett*, 168 Kan. 428, 435, 213 P.2d 964 (1950). The Kansas Supreme Court has said that "[i]n such cases it is ordinarily the province of the jury to determine as a matter of fact whether a warranty was intended." 168 Kan. at 435; see *Young & Cooper, Inc. v. Vestring*, 214 Kan. 311, 325, 521 P.2d 281 (1974). That said, it is unnecessary for us to remand this issue for jury determination because even if an express warranty exists, the Warranty Agreement effectively disclaims it.

### (3) Even if the sales representative's puffery were an express warranty, the Warranty Agreement disclaimed it.

As for limitation of warranties, the UCC provides:

> "Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article on parol or

32

extrinsic evidence (K.S.A. 84-2-204) negation or limitation is inoperative to the extent that such construction is unreasonable." K.S.A. 84-2-316(1).

In other words, a written disclaimer is ineffective if it is inconsistent with the express warranty. Here, the Straub salesperson's comment that "the Sprayer was a good product that would do what [Flaherty] needed it to do" is consistent with the Warranty Agreement, providing that CNH would pay the cost for any defect in material or workmanship. If there was no defect in the product, then it would be a "good product" that did "what [Flaherty] needed it to do." The only reason the Sprayer would not do what Flaherty needed it to do would be if there was some defect in material or workmanship. This is not a case in which CNH extended its liability beyond product defects. CNH did not warrant that the Sprayer would operate or perform in a certain manner, other than a normal manner free of defects. Assuming for the sake of argument that Everhart's comment created an express warranty, it is consistent with the Warranty Agreement. Thus, the district court did not err in holding that the Warranty Agreement disclaimed any express warranty created by the Straub salesperson.

> D. The Warranty Agreement required Flaherty to prove that the Sprayer had a defect in material or workmanship.

Flaherty next argues that the district court erred in holding that his claim for breach of express warranty required him to prove that the Sprayer had a specific product defect.

Whether a claim for breach of express warranty requires proof of a specific product defect presents a question of law subject to unlimited review. See *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, Syl. ¶ 2, 262 P.3d 336 (2011).

33

The district court cited a federal case, *Sithon Maritime Co. v. Holiday Mansion*, 983 F. Supp. 977 (D. Kan. 1997), for the proposition that "where an express warranty provides that a product is free of defect in material and workmanship, the claimant must identify evidence of a defect in the material or workmanship to overcome a motion for summary judgment." Flaherty asserts that *Sithon Maritime* does not state this proposition. Rather, he argues, "[t]he *Sithon Maritime* court simply suggests summary judgment could be avoided by showing *either* a product defect *or* the product failed within the warranty period while being used in a way covered by the warranty."

Flaherty is correct that not all warranty cases require proof of a specific defect. Our Supreme Court has stated:

> "A manufacturer may by express warranty assume responsibility in connection with its products which extends beyond liability for defects. All express warranties must be reasonably construed taking into consideration the nature of the product, the situation of the parties, and surrounding circumstances. However, defects in the product may be immaterial if the manufacturer warrants that a product will perform in a certain manner and the product fails to perform in that manner. Defects may be material in proving breach of an express warranty, but the approach to liability is the failure of the product to operate or perform in the manner warranted by the manufacturer." *Huebert v. Federal Pacific Electric Co., Inc.*, 208 Kan. 720, 725, 494 P.2d 1210 (1972).

See also K.S.A. 84-2-313 Kansas Comment 5 ("[I]n an express warranty case it is not necessary for a buyer to show a defect. Instead, a buyer must show only that the goods do not conform to the representation."). But here CNH made no warranty that extended beyond liability for defects. The Warranty Agreement covers only "DEFECT[S] IN MATERIALS OR WORKMANSHIP." Thus, while not all express warranty actions require proof of defects, this one does because defects are the only thing that the warranty protects against.

34

Flaherty cites several distinguishable cases on this point. First, he relies on *Scottsdale Ins. Co. v. Deere & Co.*, 115 F. Supp. 3d 1298 (D. Kan. 2015). There, Chris and Karly Chereny purchased two John Deere combines. Like the Warranty Agreement here, Deere's express warranty provided that it would "repair or replace any covered part that is found to be defective in material or workmanship during the warranty term." 115 F. Supp. 3d at 1302. A fire destroyed one of the combines during harvest operations. The Cherenys' insurance company, Scottsdale Insurance Company, sued John Deere for breach of express warranty and breach of the implied warrant of merchantability.

The federal court held Scottsdale's expert was not qualified to testify about a defect in the combine. 115 F. Supp. 3d at 1302. The court granted John Deere summary judgment on the implied warranty claim but held summary judgment was improper on the express warranty claim. 115 F. Supp. 3d at 1306-07. The court noted Scottsdale had to "prove that the combine suffered from a defect in material or workmanship to prevail on its breach of express warranty claim." 115 F. Supp. 3d at 1308.

John Deere argued Scottsdale could not prove there was a defect because the court did not allow Scottsdale's expert to testify. But Scottsdale had other evidence of a defect, namely that shortly before the fire, the combine was shooting flames from the exhaust. John Deere did "not counter with evidence that flames shooting from the exhaust are a normal part of operation for [the combine]." 115 F. Supp. 3d at 1308. Instead, it asserted that the flames were "likely caused by crop debris accumulated on the combine over the course of a seven-hour day of harvesting." 115 F. Supp. 3d at 1308. The district court rejected John Deere's motion for summary judgment because of this factual dispute:

> "Deere's contentions of fact indicate that the fire was not caused by a component failure; Scottsdale's contentions of fact indicate that some emissions component ignited within combine's exhaust system, evidencing a defect. This factual dispute is material because it affects the determination of whether the combine suffered from defective

35

materials or workmanship. The dispute is genuine because a reasonable juror might conclude that fire shooting from the combine's exhaust, together with a lack of definitive proof of other causes and an expert opinion that the fire originated near the DPF, is sufficient evidence to prove a defect." 115 F. Supp. 3d at 1308.

This case is distinguishable for two reasons. First, there is no factual dispute that would preclude summary judgment. The parties both accept the experts' reports and use them to argue their respective positions. Second, and more important, Flaherty has not provided evidence of a defect that could cause a fire or evidence that the Sprayer was acting in a way that suggested a defect. This is in contrast to *Scottsdale*, which had evidence that the combine was shooting flames out of its exhaust before the fire. Flaherty's failure to provide evidence of a defect is fatal to his claim.

Flaherty also relies on *Scheuler v. Aamco Transmissions, Inc.*, 1 Kan. App. 2d 525, 571 P.2d 48 (1977). There, Ruth Scheuler brought a wrongful death action, premised on breach of express and implied warranties, against Aamco Transmissions, Inc. She alleged that a problem with a car transmission installed by Aamco caused her father's (George Utter) death. The evidence showed that Utter turned on the car and that the car spontaneously put itself in reverse. The car ran over Utter, killing him. Aamco argued that it did not breach the express warranty because there was no evidence of a specific defect in the transmission. But this court found that Aamco's warranty extended beyond defects. 1 Kan. App. 2d at 529. This court held that through its advertising materials, Aamco expressly warranted the installation and performance of the transmission. 1 Kan. App. 2d at 528. Because Aamco warranted the performance of the transmission, Scheuler's "burden was only to demonstrate that it did not perform in the manner warranted. Proof of a specific defect was not required." 1 Kan. App. 2d at 529.

In *Scheuler*, there was "considerable evidence concerning Aamco advertising." 1 Kan. App. 2d at 527-28. Here, however, Flaherty made vague claims that he "reviewed materials about the Sprayer on CNH's website." He did not identify the marketing

36

materials on which he relied. Thus there is no basis for this court to find that the advertising materials formed an express warranty related to the Sprayer's performance. Again, Flaherty had to establish that the Sprayer did not perform in the manner warranted, which required proving that the Sprayer had a defect in material or workmanship.

Flaherty cites *Cricket Alley Corp. v. Data Terminal Systems, Inc.*, 240 Kan. 661, Syl. ¶ 3, 732 P.2d 719 (1987), for the Kansas Supreme Court's statement that "[t]he buyer is not required to prove what defect or shortcoming in the design or manufacture of the product prevented its functioning as warranted." There, Cricket Alley Corporation bought computerized cash registers from Data Terminal Systems, Inc. (DTS). DTS told Cricket Alley that the cash registers would be able to communicate with Cricket Alley's Wang computer in the general office. After purchasing the DTS cash registers, Cricket Alley discovered that they could not communicate with the Wang computer. The court noted that there was sufficient evidence that DTS created an express warranty that its products could communicate with the Wang computer. 240 Kan. at 664. An expert testified that the DTS equipment was at fault for the communication problems. DTS complained on appeal that Cricket Alley failed to provide evidence of a specific defect in its cash registers. The court rejected this argument, stating that Cricket Alley only had to prove that the DTS equipment did not perform as warranted. 240 Kan. at 666. In other words, Cricket Alley only had to prove that the DTS cash registers could not communicate effectively with the Wang computer.

Here, the Warranty Agreement provided that the Sprayer would be free of defects in materials or workmanship. To prove that the Sprayer did not perform as warranted, Flaherty needed to show a defect in materials or workmanship. Unlike *Cricket Alley*, Flaherty has not proven that CNH's equipment is at fault for the fire. For similar reasons, other cases Flaherty cites are distinguishable. See *Cantrell v. R. D. Werner Co.*, 226 Kan. 681, 684-85, 602 P.2d 1326 (1979) (holding that plaintiff did not have to show a specific

defect in a ladder which collapsed and injured him because, while the express warranty covered defects in material or workmanship, the manufacturer of the ladder also warranted that the product was good quality, light, strong, and safe); *Huebert*, 208 Kan. 725 (holding that plaintiff, who was electrocuted after opening a panel box even though the switch showed that the power was off, did not have to show a specific defect in an electrical switch because the manufacturer of the switch expressly warranted that no electric current would run through the panel when the switch was in the off position); *Voelkel v. General Motors Corp.*, 846 F. Supp. 1468, 1478 (D. Kan. 1994) (noting that the plaintiff did not have to prove the existence of a specific defect in a seat belt buckle because the manufacturer expressly warranted that the seat belts were "'trouble-free, safe, of superior craftsmanship, built and manufactured with high quality materials and workmanship'").

Finally, Flaherty briefly mentions *Stair v. Gaylord*, 232 Kan. 765, 659 P.2d 178 (1983), to support his argument. In *Stair*, a commercial strawberry grower bought an irrigation system. The system included a hose manufactured by Goodyear Tire & Rubber Company. Goodyear's five-year warranty ensured that "the hose would be 'free from defects in material and workmanship.'" 232 Kan. at 770. But the hose developed a hole which caused a loss of water pressure and resulted in a shutdown of the irrigation system. Goodyear offered to fix the hose, but the grower did not receive a new hose until after his crop was severely damaged. The grower sued Goodyear and others alleging, among other things, breach of express warranty and breach of the implied warranties of merchantability and fitness. The district court entered a directed verdict in favor of the defendants. The Kansas Supreme Court reversed the district court insofar as it ruled that there was no evidence of breach of the express warranty. 232 Kan. at 770-71. The court held that the existence of the hole was evidence that the product was defective. 232 Kan. at 770. Goodyear's willingness to replace the hose provided further evidence of a defect. The court concluded that the issue should have been submitted to a jury. 232 Kan. at 771. This case works against Flaherty's argument. The Kansas Supreme Court reversed the

38

directed verdict because there was evidence of a defect. Here, there is no evidence of a defect. The Sprayer was on fire, but there was no evidence that a defect caused the fire.

The Warranty Agreement created an express warranty against defects in materials or workmanship. Unlike in many cases Flaherty cited, there were no additional warranties created. To prevail on his express warranty claim, Flaherty had to prove that the Sprayer did not have the properties warranted which meant he had to show a defect in material or workmanship. Neither of Flaherty's experts could identify a defect in the Sprayer. Bitar did not believe it was possible to identify what caused the fire. And Grier specifically stated that he had no opinion about whether a defect in the design or manufacture of the Sprayer caused the fire. Thus, the district court did not err in granting summary judgment to CNH for Flaherty's failure to identify evidence of a defect in the material or workmanship.

> *E. Flaherty was also required to prove the existence of a defect to succeed on his implied warranty claim.*

The UCC creates an implied warranty of merchantability, providing: "Unless excluded or modified . . . , a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." K.S.A. 84-2-314(1). The parties agree that an implied warranty exists here. The district court rejected Flaherty's implied warranty claim because Flaherty failed to prove that there was a defect in the Sprayer. Flaherty now asserts that he presented sufficient evidence that a product defect caused the fire and that he negated speculation that arson caused the fire.

Under an implied warranty of merchantability, goods must be "fit for the ordinary purposes for which such goods are used." K.S.A. 84-2-314(2)(c). The comments to the statute state that "[t]o make out a breach under this paragraph, a buyer must show that the

goods were defective and that the defect was present when the goods left the seller's control." K.S.A. 84-2-314 Kansas Comment 4; see also *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, 467, 657 P.2d 517 (1983) ("Kansas case law has interpreted this to mean that the buyer must show the goods were defective and the defect existed at the time of the sale."). A product liability case may be proven by circumstantial evidence. *Butterfield v. Pepsi-Cola Bottling Co.*, 210 Kan. 123, 126, 499 P.2d 539 (1972).

### F. Flaherty Did Not Provide Sufficient Circumstantial Evidence to Prove That the Sprayer Had a Defect.

Flaherty acknowledges that he does not have direct evidence of a specific defect but argues that he proved a defect through circumstantial evidence.

The Kansas Supreme Court explained what circumstantial evidence is required in a products liability action:

> "For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective. Because liability in a products liability action cannot be based on mere speculation, guess or conjecture, the circumstances shown must justify an inference of probability as distinguished from mere possibility. While a plaintiff is not normally required to prove his case at the summary judgment stage, he must present some facts to support the elements of his claim." *Mays*, 233 Kan. at 54.

Flaherty argues that, while he has no expert opinion that the product was defective, he has negated other reasonable causes of the fire.

Flaherty reviews all the evidence which purportedly supports his argument that the Sprayer had a defect. But the district court found that much of this evidence was inadmissible for the purposes Flaherty wishes to use it—to prove the existence of a

defect. Kansas statute provides the standards governing how a party may introduce testimony in the form of opinions or inferences.

> "(a) If the witness is not testifying as an expert, the testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds: (1) Are rationally based on the perception of the witness; (2) are helpful to a clearer understanding of the testimony of the witness; and (3) are not based on scientific, technical or other specialized knowledge within the scope of subsection (b).

> "(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case." K.S.A. 2018 Supp. 60-456.

Flaherty begins by noting that Long, a fire investigator for the Salina Fire Department, told Captain Hughes that a battery box was the origin of the fire and that some sort of electrical issue was likely the cause. The district court held that Long's testimony was insufficient circumstantial proof of a defect. The district court was correct. Long's opinion about the origin of the fire is the type of scientific, technical, or other specialized knowledge discussed in K.S.A. 2018 Supp. 60-456. Long admitted that he conducted no formal investigation of the Sprayer. And, Flaherty never tried to designate Long as an expert witness. So his conclusions about the cause of the fire do not help Flaherty's case.

Next, Flaherty recites specific portions of his experts' reports as circumstantial evidence that a defect existed. However, Flaherty's experts did not find enough evidence to infer that the Sprayer was defective. Higday's report called the idea of an electrical short within the cab a "remote possibility" while also noting that it was "possible that

someone intentionally set the cab of the sprayer on fire." Grier, who certified Higday's report after he was unable to continue in the case, was very clear that he had no evidence to suggest that a defect caused or contributed to the fire. Bitar was also unable to determine the cause of the fire.

Flaherty also relies on the 2014 PIP bulletin issued by CNH. This bulletin called for inspection of the hydrostatic drive hoses at the engine starter. If the inspection found exposed steel braids, the bulletin recommended replacing the hydrostatic drive hose. Flaherty asserts that Bitar noted a break in an energized cable between the starter and the alternator. This, Flaherty argues, "support[s] the possibility the fire started due to contact between exposed steel braids in a hydrostatic cable and battery terminals on the starter, as contemplated in the PIP." However, the district court ruled that evidence of the PIP was inadmissible because it was too speculative. Flaherty does not challenge the district court's admissibility determination regarding the PIP in this appeal. Furthermore, Bitar's report does not support Flaherty's factual contention that there was an electrical problem with the starter. His report provides:

> "My inspection of the subject sprayer revealed severe fire damage in the cab area as well as to the engine. The electrical batteries and cables associated with the batteries to the engine revealed no signs of melting, arcing or beading which would have indicated electrical activities on the cables from the battery to the starter and alternator. I traced all these cables and identified that they were in good shape and exhibited no signs of electrical activity."

While Flaherty uses Bitar's report to support his contention that the fire started because of a problem with the battery terminals on the starter, Bitar found no signs of electrical activity on the cables from the battery to the starter.

Finally, Flaherty argues that he sufficiently negated the possibility of arson as the cause of the fire. As stated above, "[f]or circumstantial evidence to make out a prima

facie case, it must tend to negate other reasonable causes, or there must be an expert opinion that the product was defective." *Mays*, 233 Kan. at 54. Flaherty notes that Hughes, Hays, and Long did not find any physical evidence of arson at the scene. However, as the district court noted none of these people were qualified to offer an opinion about the cause of the fire. Flaherty's own experts found that arson was a possibility. The evidence supporting arson was just as inconclusive as the evidence supporting a defect.

In sum, Flaherty asks the court to make inferences that his experts would not make because they did not find evidence to support the inferences. "Before liability can result from a breach of implied warranty there must be evidence from which an inference is permissible that the product was defective at the time it left the hands of the defendant." *Querry v. Montgomery Ward & Co., Inc.*, 217 Kan. 104, Syl. ¶ 2, 535 P.2d 298 (1975). Flaherty's own experts refused to infer the presence of a defect. The district court did not err in holding that it would be inappropriate to ask a jury to make an inference based on the same evidence, especially as the jurors likely do not have the scientific, technical, or other specialized knowledge necessary to determine that a defect was present.

G. *Flaherty also failed to prove that the goods were defective at the time the Sprayer left CNH's control.*

To prove breach of the implied warranty of merchantability, Flaherty also had to show that the defect existed at the time the Sprayer left CNH's control. K.S.A. 84-2-314 Kansas Comment 4; see *Black*, 232 Kan. at 467. Because Flaherty cannot prove that a defect existed, it is impossible to determine whether the defect existed at the time it left CNH's control. We need go no further.

But even if we were to find that a defect existed at the time of the fire, Flaherty cannot prove that the defect existed at the time it left CNH's control. To reiterate,

43

Flaherty's theory is that the fire started because of an electrical issue. For purposes of this analysis we will accept—for the sake of argument—that such an electrical defect existed at the time of the fire.

The district court held that Flaherty failed to provide sufficient evidence on this point. The court relied on the fact that Flaherty had used the Sprayer for about 100 hours when he brought it to Straub, the Sprayer had several repairs before the fire, and Flaherty had modified the Sprayer to add a rear-view camera. We will examine each finding.

That Flaherty operated the Sprayer for about 100 hours before the fire is not fatal to his implied warranty claim. In *Dieker v. Case Corp.*, 276 Kan. 141, 73 P.3d 133 (2003), buyers of a combine brought an implied warranty claim against the manufacturer of the combine after the combine caught on fire. They had used the combine for around 120 hours at the time of the fire. The manufacturer argued that there was insufficient evidence that a defect existed when the combine left its control. The Kansas Supreme Court did not challenge the fact that the combine had been used before the fire. Instead, the court focused on the fact that no one had performed any maintenance or other work in the area of the alleged defect. See 276 Kan. at 162-63. Flaherty used the Sprayer here for less time than the combine was used in *Dieker*. Thus, his use of the Sprayer should not defeat his implied warranty claim.

Likewise, the fact that Flaherty installed a rear-mount camera on the Sprayer is not fatal to his implied warranty claim. At the time of purchase, the Sprayer was equipped for installation of a rear-mount camera that would allow the operator of the Sprayer to view traffic behind the Sprayer. Flaherty bolted the camera on to the Sprayer and plugged in the monitor. In *Dieker*, the court focused only on whether the area of the alleged defect had been altered since the combine left the manufacturer's control. 276 Kan. at 162-63. The installation of the rear-mount camera did not affect the areas where Flaherty alleged

44

that a defect caused the fire. As a result, this modification does not defeat a finding that the defect existed at the time the Sprayer left CNH's control.

But the district court's third basis for finding insufficient evidence on this element is sound. Flaherty admits that he had switches on the Sprayer repaired before the fire. He states: "To the extent the fire may have originated in electronics in the cab . . . two repairs had been done to electrical systems in the cab." This admission shows that the electrical system was not in the same condition that it was when the Sprayer left CNH's control. Flaherty asserts, without support, that because the repairs were done under warranty by an authorized dealer the repairs did not break the chain of causation. However, Flaherty failed to establish that a defect existed at the time the Sprayer left CNH's control—a failure that is fatal to his implied warranty of merchantability claim. See *Black*, 232 Kan. at 467.

Because we find that there is no genuine issue as to any material fact and CNH is entitled to judgment as a matter of law, we affirm the district court's grant of summary judgment in favor of CNH.

III.    *The district court did not err in holding that Flaherty could not prevail on his remaining tort claims.*

The Kansas Product Liability Act (KPLA) governs all product liability claims in Kansas. *Patton v. Hutchinson Wil-Rich Mfg. Co.*, 253 Kan. 741, 756, 861 P.2d 1299 (1993). Flaherty brought several additional causes of action against CNH that sounded in tort including negligence, strict liability, failure to warn, and negligent misrepresentation—all of which are covered under the KPLA. See K.S.A. 60-3302(c). But the KPLA does not apply to damages for economic loss. K.S.A. 60-3302(d); *Golden*, 47 Kan. App. 2d at 498 ("[T]he KPLA does not apply to claims for 'direct or

45

consequential economic loss.'"); see also K.S.A. 84-2-314 Kansas Comment 5 ("The KPLA does not apply to warranty cases involving only economic loss.").

Flaherty requested $196,057 for the cost of the Sprayer, $300 for diesel fuel in the Sprayer, $1,000 for a rear-mount camera system installed on the Sprayer, and $75 for diesel exhaust fluid. The district court correctly noted that these are economic losses. See *Koss Construction v. Caterpillar, Inc.*, 25 Kan. App. 2d 200, 207, 960 P.2d 255 (1998) ("[D]amage which is limited to the defective product itself is essentially economic loss."). Flaherty does not appear to challenge this holding on appeal. Instead, he alleges that the district court held that his *warranty* claims were barred by the economic loss doctrine. Yet nothing in the district court's opinion suggests that it denied Flaherty's express or implied warranty claims under the economic loss doctrine. Rather, the court relied on the doctrine to dismiss Flaherty's tort claims, a finding with which we agree and one that Flaherty does not challenge on appeal.

Affirmed.